**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re: Procter & Gamble Aerosol** | : | Case No. 2:22-md-3025 |
| **Products Marketing and Sales** | : | |
| **Practices Litigation** | : | Judge Michael H. Watson |
| | : | |
| | : | Magistrate Judge Chelsey Vascura |

**This document relates to: <u>ALL CASES</u>**

**NON-SETTLING PLAINTIFFS' OPPOSITION**
**TO MOTION FOR PRELIMINARY APPROVAL OF CLASS**
**ACTION SETTLEMENT, CERTIFICATION OF A SETTLEMENT**
**CLASS, APPROVAL OF THE NOTICE PLAN AND FORMS OF NOTICE**
<u>**AND SETTING DATES AND PROCEDURES FOR FINAL FAIRNESS HEARING**</u>

## I.    INTRODUCTION

Various Non-Settling Plaintiffs ("NSPs") respectfully urge this Court to deny Settling Plaintiffs' ("SPs") Motion for Preliminary Approval, ECF No. 23 ("MPA"). This Settlement was driven not by SPs' earnest efforts to maximize Class recovery, but rather their own fear over a pending JPML determination. Recognizing Defendant's attempt to exploit a difference of opinion among plaintiffs' counsel, NSPs recognized the impropriety of participating in a 'reverse auction,' telling Defendant (and SPs) the Class would best be served after the transferee court appointed leadership, and certain, albeit very circumscribed, discovery was produced by Defendant about the nature and scope of the benzene contamination at issue in this case.

Plaintiffs' Mediation Counsel,[1] however, took Defendant's bait.  They began negotiating a

---

[1] SPs define "Plaintiffs' Mediation Counsel" as "Gary M. Klinger, Kevin Laukaitis, Steven Bloch, Mark S. Reich, Rick Paul, Terence R. Coates, Paul Doolittle, Bryan F. Aylstock, R. Jason Richards, Kiley Grumbacher, Jonathan Jagher, and Richard. S. Wayne[.]" MPA at 6.

deal with Defendant before the Panel issued its transfer order. The ultimate result was a hastily-prepared settlement, which included, *inter alia*, provisions that:

- Substitute a more lenient '1 ppm' standard still allowing for the presence of carcinogenic benzene in the Products, in place of the FDA's zero-tolerance '0 ppm' Guidance;

- Divest federal and state governments of enforcement authority with respect to the Products' benzene levels, even upon their finding that the Products are adulterated or misbranded;

- Drastically slash benefits under Defendant's then-existing voluntary refund program; and

- Retroactively release claims of consumers who participated in the voluntary refund program, even though they are precluded from additional recovery under the Settlement, as well as claims beyond the scope of the underlying actions.

Procedurally improper and substantively bankrupt, the Settlement should be rejected, even at the preliminary approval stage. In accordance with its powers and duties under the Multidistrict Litigation Act, this Court should solicit applications for leadership to extinguish the 'reverse auction' atmosphere, so that a settlement in the best interests of the Class may be reached. As proof of this, the Court need look no further than the fact that Defendant had more than $100 million in sales of the accused Products, and claims exist here for disgorgement of those ill-gotten gains; yet a massive disconnect exists between those sales figures and the paltry recovery made available to the proposed settlement class.[2]

## II.    RELEVANT HISTORY

### A.    Valisure Testing Revealed what Defendant Already Knew: Benzene was Present in the Products

Defendant manufactures and sells a variety of aerosol personal hygiene products which are

---

[2] Although the proposed settlement contemplates up to approximately $8,000,000 in payments (*see* Set. Agmt. ¶ 3.2), it is a contemplated voucher program and thus any unused funds will remain with Defendant, and class payments are subject to expiration. *See id.* ¶ 4.7. If Defendant's prior voucher/recall program suggests anything, it is that much of the contemplated settlement value will revert back to, or remain in the first place with, Defendant.

the subject of the proposed settlement. *See* MPA at 3-4 (the "Products"). According to FDA, benzene—a dangerous 'Class I' carcinogen—should not be present in these Products at any level. However, on November 3, 2021, Valisure LLC ("Valisure"), an independent analytical pharmacy, revealed testing that various products (including Defendant's) contained benzene.[3]

In justifying the value of the settlement, SPs point to their 'informal discovery findings' that Defendant was unaware of any benzene contamination, and moved quickly to rectify the situation, claiming that "[i]nformation provided in informal discovery indicates that P&G first became aware of the benzene contamination in some of the P&G Products through the filing of Valisure's Citizen Petition with the [FDA] on November 3, 2021…Immediately thereafter, P&G initiated an investigation concluding that the benzene identified in some product samples stemmed from the isobutane used as a propellant in those aerosol product lines." MPA at 4-5.

But documents (albeit an extremely circumscribed set) produced to certain plaintiffs' counsel only prior to SPs' mediation tell a very different story. Weeks before the Valisure Citizen Petition, Defendant received a letter from its contract manufacturer, stating in part:

> As I am sure you are aware, over the last few months there have been multiple brand-initiated, OTC Aerosol voluntary recalls related to levels of Benzene in finished product…
>
> In certain environments and formula compositions, hydrocarbon propellent has been identified as one potential source. I am happy to communicate that our Procurement Team has been able to secure supply of hydrocarbon propellant that has a guarantee from our source(s) of < 1ppm Benzene… While Voyant has executed this change, we encourage our customers to perform their own internal diligence on their products and reach out with any questions.

Oct. 21, 2021 Letter from Voyant Beauty, LLC to Mark Ragase (Procter & Gamble), Bates PG 519, attached hereto as Exhibit 1.

---

[3] For a press release and link to the Citizens Petition, *see* https://www.valisure.com/valisure-newsroom/fda-citizen-petition-6-benzene-in-body-spray-products.

Defendant's knowledge is important to determining the extent of its financial liability under various causes of action (and thus important to evaluating the strength of the settlement). As noted above, SPs acknowledge this,[4] yet fail to account for the Voyant letter in their assertions of Defendant's benign conduct.[5] Redacted

Redacted

Redacted

### B.  Non-Settling Plaintiffs Originate Litigation, Followed by Other Suits

Shortly after Valisure's announcement, one of the NSPs (represented by the undersigned) originated litigation in the Southern District of Florida. *Bryski v. The Procter & Gamble Co.*, No. 21-62285 (S.D. Fla. filed 11/4/21). This 'first-filed' complaint was well detailed in both facts and law, evidencing NSPs thorough research and preparation to litigate the action. *See, e.g., id.* ¶¶ 8-9 (Valisure's findings), 10 (history and risks of benzene), 11- 13 (regulatory framework for 'over-

---

[4] Applauding SPs' pre-mediation due diligence efforts, Mr. Klinger explains that SPs sought a "comprehensive list of documents and data with which to evaluate the any [sic] resulting settlement"; first of which was "information regarding P&G's notice of benzene contamination[.]" Declaration of Gary Klinger, ECF No. 23-2 ("Klinger Decl.") at ¶¶ 9-10.

[5] Presumably, SPs chose to ignore the Voyant Letter and simply rely on Defendant's response to an FDA-mandated question on its FDA recall request form, in which Defendant told the FDA that it did not learn of the presence of benzene until the Citizen Petition's filing on November 4, 2021. Recall Disclosure Form, Bates PG 335-341 (attached hereto as Exhibit 2), at 338. Defendant goes on to claim that it launched its investigation on November 4, 2021, and that investigation identified the "root cause" of the benzene to be the "hydrocarbon propellants" used by Voyant. *Id.* at 338-339. Voyant however notified Procter of the hydrocarbon propellant benzene issue well before Defendant initiated its 'investigation.'



[6] Redacted

Further, the Voyant Letter made abundantly clear that the issue was well known in the industry, referencing "very difficult times" and benzene-related recalls "I am sure you are aware of[.]" Ex. 1.

the-counter' products), 14-20 (violations of misbranding and adulteration provisions of FFDCA and state counterpart), and 22 (Defendant's website statement that it does not use benzene in its products).[7] Notably, the second, fourth, and fifth cases filed were also by non-settling plaintiffs.

### C.     Defendant's Recall and Reimbursement / Voucher Program

On November 23, 2021—weeks after the *Bryski* action was filed—Defendant announced a voluntary nationwide recall for specific Old Spice and Secret Aerosol Products.[8] Part of the recall included a replacement coupon (called a "voucher") program for consumers. Ex. 3 at 4. Thereunder, consumers could fill out an online form to request replacement coupons (unlimited with proof of purchase or *up to five without proof of purchase*). *Id.* at 4-5. Consumers who call P&G's customer service line could request cash refunds in lieu of vouchers, and could seek up to seven vouchers or cash reimbursements. *Id.* at 5; *see also* Recall Script, bates PG 545-547, attached hereto as Exhibit 4, at 547. When proof of purchase was not available, the value of the cash payment generally matched the value of the coupon.[9]

The coupon's value (and by extension the cash payment) "exceed[ed] P&G's manufacturer's suggested retail price of the…product." Ex. 3 at 4-5. The coupon / cash value depended on which product line the consumer purchased: $10 (Hair Food), $9 (Pantene, Waterl<ss), $7 (Old Spice, Secret, Herbal Essences), $6 (Aussie Hair), or $5 (Old Spice Hair). *Id.* at 5, fn. 5. There was no cut-off date for past purchases, and consumers were not required to release

---

[7] On behalf of a nationwide class and Florida-only subclass, the complaint alleged violations of Florida's Deceptive and Unfair Trade Practices Act, Fla Stat. §§ 501.201, et seq. ("FDUTPA"), unjust enrichment, and implied and express warranties. *Id*. at ¶¶ 35-61.

[8] *P&G Issues Voluntary Recall of Specific Old Spice and Secret Aerosol Spray Antiperspirants and Old Spice Below Deck Aerosol Spray Products Due to Detection of Benzene*, avail. at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice.

[9] A. Soukup email to R. Casey (July 7, 2022), attached hereto as Exhibit 5.

any potential claims. *See* Web Forms (bates PG 520-544), attached hereto as Exhibit 6; *see also* Ex. 5 (confirming no additional forms). Further, it does not appear that the 'no proof of purchase cap' (5 online, 7 by telephone) was applied on a household basis. *Id.*

Thus, in theory, an individual with *no proof of purchase* would be eligible for up to $70 in either vouchers or cash reimbursements for seven 'Hair Food' products. According to Defendant, the average 'cash refund' claimant received $25.43, while the average 'voucher' claimant received $18.51 in vouchers. Ex. 3 at 5 (dividing dollar amounts by number of consumers).

At no point during the voucher / refund program were consumers given a 'deadline' by which to apply for a coupon or cash refund. Further, the program was still active at the time the SPs and Defendant went to mediation on March 28, 2022. Ex. 3 at 2 (Defendant "continues to offer" relief). Through the end of May 2022, Defendant had provided to U.S. consumers a total of 482,758 vouchers totaling $3,594,951 in value and 995 cash refunds totaling $25,080.[10] SPs claim (with no citation) that the recall program "was terminated by P&G in April 2022[,]" not surprisingly right around the time the settling parties had come to an agreement. MPA at 5.

### D. Mediation Counsel Were Desperate to Settle Before a JPML Transfer Order and Appointment of Leadership, While Non-Settling Plaintiffs Refused to Negotiate From a Position of Weakness

On December 13, 2021, Defendant petitioned the Judicial Panel on Multidistrict Litigation ("JPML") to transfer and consolidate the then-existing eleven actions pursuant to 28 U.S.C. § 1407. *In re Procter & Gamble Aerosol Prods. Marketing & Sales Prac. Litig.*, MDL No. 3025, ECF No. 1-1 (JPML filed Dec. 13, 2021) ("Def. MDL Br."). Defendant sought centralization in the Southern District of Florida. *Id.* at 10-13. In support thereof, Defendant explains that the

---

[10] A. Heath email to G. Klinger, R. Wayne (June 7, 2022), bates PG 573, attached hereto as Exhibit 7.

Southern District of Florida is the site of the first-filed case, two overall pending cases, has been repeatedly recognized as a convenient and accessible forum, and has a significantly lower average caseload than other courts.[11] *Id.* at 10-12. Interested Party Responses were due January 4, 2022.

On December 15th, lead counsel in the first-filed (and NSP) case had a teleconference with defense counsel. Decl. of Ruben Honik filed herewith as Exhibit 9 ("Honik Decl.") at ¶ 2. Defense counsel revealed he was contacted by other plaintiffs' counsel regarding early resolution, but it was discussed, and defense counsel did not disagree, that this may be premature given there had been no JPML transfer and leadership appointment. *Id.*

In an effort to begin a cooperative dialogue with other plaintiffs' attorneys, and prevent Defendant from exploiting any putative rifts to 'shop around' for the best deal, the Honik firm on December 17th undertook to reach out to all plaintiffs' counsel in known cases to informally coordinate a plaintiff-side approach to establish a unified front against any effort by Defendant to peruse a 'fire sale' early settlement. *Id.* ¶ 3. To this end, following initial reach-out efforts, a Zoom teleconference invitation was sent to all known plaintiffs' counsel on December 23, 2022, scheduling the teleconference for December 30, 2021. *Id.* ¶ 4. Additional plaintiffs' counsel were invited on December 29, 2021. *Id.* ¶ 5. The Zoom teleconference occurred on December 30, 2021, and was attended by many counsel for SPs and NSPs. *Id.* ¶¶ 5-6.

Two important revelations came from that teleconference. First, it was clear that two 'groups' of plaintiffs' attorneys were taking shape, coalescing largely around whether transfer to the Southern District of Florida or Southern District of Ohio would be appropriate. *Id.* ¶ 6. Second, counsel for defendant had told both groups that the other group had 'reached out' regarding

---

[11] For example, Defendant noted that while the Southern District of Florida has 378 cases per judgeship, the Southern District of Ohio has 2,257 cases per judgeship. *Id.* at 11-12.

settlement. *Id.* ¶ 7. The undersigned explained, however, that he had informed defense counsel that any settlement prior to the appointment of MDL leadership would be inappropriate. *Id.* ¶. At no point did any of members of Mediation Counsel disclose any substantive settlement talks or mediation plans. *Id.* ¶ 8.

Interested Party Responses were due on January 4, 2022. As of that day, twenty-two cases had been filed in twelve different districts in eight states.[12] Fifteen Interested Party Responses were filed on January 4, with eleven supporting Florida[13] and only four supporting Ohio.[14] Of the twenty-two cases thus filed, fourteen (including the first and second filed cases) supported transfer to the Southern District of Florida,[15] seven supported transfer to the Southern District of Ohio,[16]

---

[12] The number of cases per state were: California (3), Florida (3), Illinois (2), Massachusetts (1), New York (4), Ohio (6), Oregon (1), and Pennsylvania (1). *See generally* JPML Docket Sheet, MDL No. 3025.

[13] MDL No. 3025, ECF Nos. 24, 28, 31, 32, 34, 35, 36, 41, 43, 44, and 46,

[14] MDL No. 3025, ECF Nos. 30, 38, 40, and 45.

[15] *Ascensio*, No. 21-11212 (S.D.N.Y. filed Dec. 30, 2021) (ECF No. 43); *Bernsee*, No. 21-6725 (N.D. Ill. Filed Dec. 17, 2021) (ECF No. 28); *Bryski*, No. 21-62285 (S.D. Fla. filed Nov. 4, 2021) (ECF No. 34) (first filed case); *Campbell*, No. 21-774 (S.D. Ohio filed Dec. 14, 2021) (ECF No. 35); *Canaday*, No. 21-2024 (S.D. Cal. filed Dec. 1. 2021) (ECF No. 41); *Clayton*, No. 21-24426 (S.D. Fla. filed Dec. 22, 2021) (ECF No. 34); *Delcid*, No. 21-9454 (S.D.N.Y. filed Nov. 15, 2021) (ECF No. 43); *Dethrow*, No. 21-1723 (S.D. Ill. filed Dec. 20, 2021) ECF No. 36); *Freund*, No. 21-6934 (E.D.N.Y. filed Dec. 16, 2021) (ECF No. 31); *Hudnall*, No. 21-12507 (D. Mass. filed Dec. 16, 2021) (ECF No. 46); *Leyva*, No. 21-10108 (S.D. Fla. filed Nov. 15, 2021) (ECF No. 43); *Lyle*, No. 21-1760 (D. Or. filed Dec. 7, 2021) (ECF No. 32); *Quinones*, No. 21-9595 (C.D. Cal. filed Dec. 10, 2021) (ECF No. 44); and *Toporek*, No. 21-6185 (E.D.N.Y. filed Nov. 5, 2021) (second filed case) (ECF No. 24). ECF Numbers refer to the Interested Party Response on the JPML Docket.

[16] *Baker*, No. 21-734 (S.D. Ohio filed Nov. 23, 2021) (ECF No. 38); *Blake*, No. 21-794 (S.D. Ohio filed Dec. 23, 2021) (ECF No. 40); *Esquivel*, No. 21-762 (S.D. Ohio filed Dec. 8, 2021) (ECF No. 30); *Kelley*, No. 21-785 (S.D. Ohio filed Dec. 17, 2021) (ECF No. 38); *Labella*, No. 21-216 (W.D. Penn filed Dec. 17, 2021) (ECF No. 40); *Pickens*, No. 21-786 (S.D. Ohio filed Dec. 17, 2021) (ECF No. 45); and *Velasques*, No. 21-723 (S.D. Ohio filed Nov. 19, 2021) (ECF No. 30). ECF Numbers refer to the Interested Party Response on the JPML Docket.

and one case[17] took no position.

Though they were ultimately successful, the attorneys supporting transfer to Ohio could not have felt confident after Interested Party Responses were filed. Yes—they were located in the Defendant's home district. But the majority of plaintiffs, the Defendant, *and* the first-filed case all sought transfer to the Southern District of Florida. Defendant's January 11th Reply Brief in support of transfer to the Southern District of Florida underscored this, as it took direct aim at many of the arguments made in support of this District. MDL No. 3025, ECF No. 12.

Presumably, the minority pro-Ohio group believed (but without good reason) that transfer to the Southern District of Florida meant exclusion from leadership.[18] With the JPML chips seemingly stacked against them, and a March 31, 2022 JPML oral argument date on the horizon, the pro-Ohio attorneys were at a crossroads. Either accept Defendant's invitation to negotiate from a position of weakness, or—as the pro-Florida group had maintained from Day 1—wait until a leadership structure was appointed so as to preclude Defendant from 'settlement shopping.'

Unfortunately, self-interest prevailed over the Class's interests, and the pro-Ohio group decided to press for a settlement. It is hardly a coincidence that of the seven cases seeking transfer to this District, all were represented by one or more 'Plaintiffs' Mediation Counsel.' By contrast, only one of the eleven cases supporting transfer to the Southern District of Florida was represented by Plaintiffs' Mediation Counsel (namely, *Bernsee*, represented in part by Mr. Klinger).

In the weeks following the submission of JPML briefing, counsel for *Bryski* became aware that certain attorneys seeking transfer to Ohio were seeking a quick settlement (likely on whatever

---

[17] ***Aviles***, No. 21-2108 (E.D. Cal. filed Nov. 12, 2021).

[18] At no point was this communicated to the Ohio group. Honik Decl. ¶¶ 8, 12. The undersigned NSP counsel initiated multiple calls including both Ohio groups to facilitate communication and a good working relationship. *Id.* ¶¶ 2-13. His primary concern was avoiding a 'pick-off' settlement whereby Defendant could 'choose' between competing groups with whom to settle. *Id.* ¶11.

terms they could get). Honik Decl. ¶ 9. He emailed defense counsel that it had "been brought to my attention that a couple of plaintiffs lawyers . . . . have been agitating for an early mediation and engagement with your client concerning resolution of this litigation." 1/28/22 R. Honk email to A. Soukup, attached hereto as Exhibit 8. He continued: The vast majority of the remaining plaintiffs who are aligned with me and my team are unalterably opposed to this end around. While we would welcome, at the appropriate time and place, an opportunity to discuss a pathway to resolution with your client, we are not on board with any effort that these rogue plaintiffs are attempting. As I mentioned to you early on in this litigation, we will not countenance an Aylstock style sunscreen resolution in this case." *Id.*

On February 1, 2022, the undersigned organized a second Zoom call (for February 7th), inviting all counsel (including the Ohio group), so as to touch base following the closure of JPML briefing. Honk Decl. ¶ 10. Counsel for SPs and NSPs alike were in attendance. *Id.* ¶ 10. At no point during that call did any counsel disclose their settlement or mediation efforts. *Id.* ¶¶ 11-12. On February 14, 2022, the JPML set oral argument for March 31, 2022. This effectively set a deadline for Mediation Counsel to mediate the case and establish a settlement framework. The events that followed are known only to Mediation Counsel and Defendant, but the decision to mediate was made at least prior to March 14th, when the confidentiality agreement was executed.

Their scheduled mediation occurred on March 28th, just days before the JPML oral argument. At no point prior to the mediation did "Plaintiffs' Mediation Counsel reach…out to certain attorneys representing plaintiffs in other pending cases against P&G, including those pending in the Southern District of Florida ("Non-settling Plaintiffs' Counsel"), to participate in a potential mediation." MPA at 6; *see also* Honik Decl. ¶ 12. While there was some general discussion regarding the possibility of early resolution, NSPs were never informed that an actual

mediation had been scheduled, and were plainly not invited to same. *Id.* ¶ 13.

Purportedly, no agreement was reached at mediation. Three days later, Defendant was able to 'ramp up the pressure' on Mediation Counsel by forcefully arguing for the Southern District of Florida at JPML oral argument. This is an important point—at all times during which Defendant was seeking resolution with Mediation Counsel, it was simultaneously pursuing a strategy before the JPML it knew would pressure attorneys inclined to put self-interest above those of the Class.

As explained below, Defendant's strategy worked.

## III.    LAW AND ARGUMENT

### A.    Legal Standard for Preliminary Approval

Civil Rule 23(e) authorizes a court to grant preliminary approval of a proposed class action settlement and direct notice to putative class members if it might be approvable as fair, reasonable, and adequate.  Rule 23(e)(2) sets forth four factors to consider this:

(A)   whether the class representatives and class counsel have adequately represented the class;
(B)   whether the proposal was negotiated at arm's length;
(C)   whether the relief provided for the class is adequate, taking into account:
    (i)    the costs, risks, and delay of trial and appeal;
    (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
    (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and
    (iv)  any agreement required to be identified under Rule 23(e)(3); and
(D)   whether the proposal treats class members equitably relative to each other.

These requirements encompass factors already employed by the Sixth Circuit such as:  (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013). The Sixth Circuit also has 'looked to whether the settlement gives preferential treatment to the named

plaintiffs while only perfunctory relief to unnamed class members." *Id.* at 756 (internal quotation marks and citation omitted). In light of the substantial overlap, courts within the Sixth Circuit often consider the factors together. *Macy v. GC Servs. L.P.*, No. 15-819, 2019 U.S. Dist. LEXIS 210632, at *4-5 (W.D. Ky. December 6, 2019).

### B. The Multidistrict Litigation Act Was Meant to Prevent Precisely the Type of 'Structural Collusion' That Gave Rise to the Proposed Settlement

At its heart, the Multidistrict Litigation Act is aimed at "promot[ing] the just and efficient conduct" of multi-state proceedings. 28 U.S.C. § 1407(a). "It is the responsibility of the court…to ensure that [structural] conflicts are neutralized," including "conflicts over control of the litigation." *In re Simon II Litig.*, No. 00-2340, 2002 WL 35078407, at *98 (E.D.N.Y. Oct. 22, 2002) (internal quotations marks and citation omitted). The risk of 'structural collusion' is especially prevalent where there exists "a jurisdiction competition among different teams of plaintiffs' attorneys[.]" John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1370 (1995).

To avoid this risk in the MDL context, "[f]air and efficient resolution of complex litigation requires at least that…the court exercise early and effective supervision (and, where necessary, control)[.]" Fed. Jud. Ctr., MANUAL FOR COMPLEX LITIG. (4th ed.) ("Manual") § 10.[19] Ideally, to avoid a competition-driven settlement, "[i]n some cases the attorneys coordinate their activities without the court's assistance, and such efforts should be encouraged." *Id.* § 10.22. NSPs attempted to do just that, refusing Defendant's invitation to negotiate while conflict existed, and attempting to organize cooperation between all the related attorneys. But where, as here, this is unsuccessful:

---

[19] Contemporaneous with the drafting of the Multidistrict Litigation Act, the Coordinating Committee prepared the Manual for Complex and Multidistrict Litigation. Coordinating Committee for Multiple Litigation of the Judicial Conference of the United States, *Manual for Complex and Multidistrict Litigation* 1 (pt. 2), J. Moore, FEDERAL PRACTICE 8 (2d ed. 1969).

> [T]he court will need to institute procedures under which one or more attorneys are selected and authorized to act on behalf of other counsel and their clients with respect to specified aspects of the litigation. To do so, invite submissions and suggestions from all counsel and conduct an independent review (usually a hearing is advisable) to ensure that counsel appointed to leading roles are qualified and responsible [and] that they will fairly and adequately represent all of the parties on their side[.]

*Id.* § 10.22. Through its actions, it is clear that Defendant did not petition the JPML for coordination to 'promote the just and efficient conduct' of the actions. Rather, it initiated JPML proceedings to create a rift between counsel out of self-interest. This is evidenced by the fact that Defendant was negotiating with the Ohio group while simultaneously presenting arguments before the Panel aimed at pressuring that very group. This is precisely the type of scenario where this Court must exercise more control, and neutralize this structural conflict so that the Class is best represented at the negotiating table. In its Transfer Order, the Panel expressed its "confiden[ce] [that this Court] will steer this litigation on a prudent course." ECF No. 1 at 2. In this instance, that means denying preliminary approval and organizing a plaintiff leadership structure.

### C. The Settlement's Injunctive Relief Replaces FDA Guidance with a More Lenient Standard, and Is Otherwise Illusory

As if written by industry lobbyists, the Settlement actually contains a provision that would gut FDA Guidance as to permissible levels of benzene in the Products (none) with one of Defendant's choosing (1 parts per million or "ppm"). Set. Agmt. § 3.5(c). At best, it results in an incredibly negative value to the Class. Further, even if it were permissible for a handful of attorneys to substitute their judgment for that of FDA scientists, SPs apparently conducted no investigation to determine the health impact of a '1 ppm' standard.

At issue is FDA's long-standing guidance as to residual solvents (solvents that remain as impurities in finished drug products). *See* FDA, *Guidance for Industry: Q3C Impurities: Residual Solvents* (Dec. 1997), avail. at https://www.fda.gov/media/71736/download ("Q3C Guidance").

13

Due to its carcinogenic nature, FDA considers benzene as a "Class I Solvent" that "should not be employed in the manufacture of drug substances."[20] As a Class I solvent, benzene is "known to cause unacceptable toxicities [and] should be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment." Q3C Guidance at 2. The Guidance actually *forbids* manufacturers from using benzene where its use is not unavoidable, stating, under the heading "Solvents to be Avoided":

> Solvents in Class 1…should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted [to 2 ppm] as shown in Table 1, unless otherwise justified.

FDA *Q3C Guidance* at 6. Since, by Defendant's own admission, a number of the Product batches contained "no detectable benzene[,]" the use of benzene is not unavoidable, and no amount of benzene is permissible. Ex. 3 at 3.

While the *Q3C Guidance* is not binding, it represents "FDA's current thinking on this topic." Q3C Guidance at 1. It "was developed within the Expert Working Group (Quality) of the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH)" and is subjected to a rigorous peer-review process. *Id.*

In his attached declaration, Philip Russ, a regulatory compliance professional with 27 years of experience, explains that the Q3C Guidance provides that benzene is a Class 1 substance. *See* Declaration of Philip Russ ("Russ Decl."), attached hereto as Exhibit 10. The Guidance further provides that Class I solvents, "if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1." *Id.* ¶ 13. For benzene, the limit would be 2 ppm if the use of benzene "is unavoidable." *Id.* As

---

[20] Appendix I to FDA Q3C Guidance, avail. at https://www.fda.gov/media/71737/download, at 5.

equivalent aerosol products are reported by the FDA not to contain any benzene, it does not appear that benzene is "unavoidable." *Id.* ¶ 14. The proposed settlement, in suggesting that P&G will test its products for "the presence of benzene at 1 ppm or more," does not speak to the guidance set forth above about no amount of benzene being present unless "unavoidable." *Id.* ¶ 15. As such, the '1 ppm standard' contemplated in the Settlement Agreement is in conflict with—and represents a dilution of—the FDA *Q3C Guidance*. *Id.* ¶ 16. The proposed settlement agreement in effect substitutes a more lenient standard for one proposed in an FDA Guidance document. *Id.* ¶ 18.

Even if this new standard could be construed as a positive development for consumers (it is not), it is entirely illusory. In October 2021, before the first lawsuit was filed, Defendant's contract manufacturer reported it was "able to secure supply of hydrocarbon propellant that has a guarantee from our source(s) of < 1ppm Benzene" which it would use from then on. Ex 1. Other provisions, such as testing requirements that expire in July or August 2022, or an agreement not to re-sell products received in a recall, similarly lack any value. Set. Agmt. §§ 3.5(b), 3.5(c)(i)-(ii).

### D. The Settlement's Monetary Portion Places Class Members in a Worse Position Than the Voucher Program Existing When the Settlement Was Negotiated

The Settlement is inadequate under Rule 23(e)(2), because the recovery is less than what Defendant already provided to the Settlement Class under the recall program. The adequacy of a settlement must be assessed as "'a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery (or reduced recovery).'" *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 08-65000 (MDL 2001), 2016 U.S. Dist. LEXIS 130467 (N.D. Ohio 2016). Here, there was *already a recovery* under the recall program: a voucher or cash payment in an amount that exceeded Defendant's suggested retail price of the product. Ex. 3 at 4-5. Anything less than what was already made available to the Settlement Class is fundamentally inadequate and inures only to Defendant's benefit. The Settlement is inferior to

15

the Defendant's recall program in several respects.

*First*, Settlement Class Members with no proof-of-purchase are entitled to fewer vouchers or cash payments than under the recall program. Under the Settlement Agreement, the total number of No Proof-of-Purchase Vouchers or No Proof-of-Purchase Payments which can be claimed may not exceed three per Household. *See* ECF No. 23-1 (the "Settlement Agreement) at § 3.2(b)(i)-(ii). Under the recall program, consumers could claim up to *five vouchers* without proof of purchase. Ex. 3 at 4-5. Consumers who called P&G's customer service line were able to request cash refunds in lieu of vouchers and could seek up to *seven vouchers* or cash reimbursements. *Id.* at 5; *see also* Ex. 4 at 547. As noted previously, an individual with no proof of purchase would be eligible for up to $70 in either vouchers or cash reimbursements (if seeking recovery for seven purchases of the Hair Food product) under the recall program, whereas the Settlement would limit the same individual to $30 in No Proof-of-Purchase Vouchers or $10.50 in No Proof-of-Purchase Payments.

*Second*, the Settlement's limitations on No Proof-of-Purchase Vouchers and No Proof-of-Purchase Payments applies by Household. Settlement Agreement at § 3.2(b)(i)-(ii). "Household" is defined as "all individuals who have their principal place of residence at a single address." *Id.* at § 1.12. If multiple individuals living in the same Household purchased several P&G Aerosol Products, they would be limited collectively to three No Proof-of-Purchase Vouchers or No Proof-of-Purchase Payments. *Id.* at § 3.2(b)(i)-(ii). Under the recall program, no such limitations existed, meaning individuals living in the same Household each would have been able to reach the 'no proof of purchase cap' (5 online, 7 by telephone). *See* Exs. 5, 6.

*Third*, the amount that could be claimed in cash payments under the Settlement (the No-Proof-of-Purchase Payment) is less than the cash payments that were available under the recall program. Settlement Class Members are entitled to a monetary payment of $3.50 for each P&G

16

Aerosol Product unit purchased within the Class Period (subject to the three unit per Household cap). Set. Agmt. § 1.32. Under the recall program, the value of the cash payment generally matched the value of the coupon (i.e., $10 for Hair Food, $9 for Panteneor Waterl<ss, $7 for Old Spice or Secret antiperspirant or deodorant products, $7 for Herbal Essences, $6 for Aussie Hair, and $5 for Old Spice Hair). Ex. 3 at 5 n.5.

*Fourth*, the Settlement provides a cut-off date for past purchases—namely the Class Period. Set. Agmt. §§ 1.16, 1.17. Under the recall program, there was no cut-off date for past purchases.

*Fifth*, Settlement Class Members have only ninety days after the entry of the Preliminary Approval Order to submit claims. Settlement Agreement at § 4.3(b). This window is even narrower considering Settlement Class Notice may be given up to thirty days after entry of the Preliminary Approval Order. *Id.* at § 4.2. The recall program lasted five months (according to SPs). MPA at 5.

Because the Settlement provides a diminished recovery compared to what was made available under the voucher / reimbursement program, it is plainly inadequate and should result in the denial of the preliminary approval motion alone.

### E. The Release Is Extremely Overbroad and Exceeds the Factual Predicate of the Underlying Actions

The Settlement is also neither fair, reasonable, nor adequate due to the broad nature of the claims released. The "Released Claims" include all claims relating to "the purchase or use of any of the P&G Aerosol Products," Set. Agmt. § 1.36, whereas the underlying claims pertained exclusively to Defendant's failure to disclose the presence of benzene in its P&G Aerosol Products.[21] Although class action releases may include claims not presented and even those which

---

[21] *See, e.g., Aviles* at ¶ 2; *Baker* at ¶ 10; *Bernsee* at ¶ 8; *Blake* at ¶ 10 (action involves Defendant's failure to disclose presence of benzene in P&G Aerosol Products); *Casolari* at ¶ 1 (same); *Dethrow* at ¶ 2 (same); *Esquivel* at ¶ 5 (same); *Hernandez* at ¶ 7 (same); *Kelley* at ¶ 10 (same); *LaBella* at ¶

could not have been presented, the claims must share an identical factual predicate as the claims pled. *See, e.g., Olden v. Gardner*, 294 Fed. Appx. 210, 220 (6th Cir. 2008) ("Because such claims have an identical factual predicate as the claims pled in the complaint, no problem is posed by their release."); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 107 (2d Cir. 2005) ("The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct."). Here, the Settlement would release claims based on conduct that is not alleged in the underlying actions.

Courts do not hesitate to deny preliminary approval where the settlement agreement does not limit released claims to those arising out of the facts alleged in the complaint. In *Chavez v. PVH Corp*., No. 13-1797, 2015 U.S. Dist. LEXIS 17511 (N.D. Cal. Feb. 11, 2015), the parties sought approval of a class action settlement that released claims relating to the payment of wages or reimbursement of wages. *Id.* at *15. The underlying complaint asserted only a violation of California Labor Code Section 203 based on the defendants' alleged practice of using payroll debit cards. *Id.* at *18. Objectors to the settlement had initiated their own complaint against the defendant, which asserted violations under the same statute for meal break, overtime, rest break, bag check, double overtime, and vested vacation pay. *Id.* at *16-17. Because the settlement would have released the claims in the objectors' action, which were based on facts beyond the scope of the underlying litigation, the court found denial of final approval of the settlement appropriate. *Id.* at *19 ("[B]ecause Defendants take the position that the settlement release will release claims for § 203 damages based on facts beyond the scope of the Chavez Complaint, the settlement would

---

7 (same); *Martinez* at ¶ 1 (same); *Mills* at ¶ 7 (same); *Pickens* at ¶ 1 (same); *Velasques* at ¶ 5 (same); *Canaday* at ¶ 2 (same).

not be fair or reasonable to class members.").

Like the complaint in *Chavez*, the underlying actions here are based on a specific factual predicate, namely, Defendant's failure to disclose the presence of benzene in its P&G Aerosol Products. The Released Claims, however, include any and all claims related to the purchase or use of any of the P&G Aerosol Products, which may include claims regarding any other misrepresentation or omission on the labeling of the product not asserted in the underlying actions (for example, misrepresentations or omissions about the products' efficacy or health effects stemming from any other ingredient). Although such claims might fall under the same general causes of action as those asserted in the underlying actions, the relevant question is not whether they share the same cause of action, but whether they share the same factual predicate—which here, they do not. Because the Settlement releases claims based on facts beyond the scope of the underlying actions, the settlement is not fair, reasonable, or adequate to the Settlement Class.

**F.     The Release Applies to Settlement Class Members Who Receive No Monetary Compensation Under the Settlement**

The release is further overly broad because it applies to certain Settlement Class Members who are precluded from receiving any monetary compensation under the Settlement. Settlement Class Members who received four or more vouchers or cash vouchers under the recall program are barred from receiving No Proof-of-Purchase Vouchers and No Proof-of-Purchase Payments. The Settlement Agreement provides that "[t]he number of Proof-of-Purchase Vouchers, No Proof-of-Purchase Vouchers, Proof-of-Purchase Payments, or No Proof-of-Purchase Payments each Settlement Class Member is entitled to receive under this Settlement shall be reduced by the number of vouchers that a Settlement Class Member or any member of the Settlement Class Member's Household has received or will receive through the Recall Program." Set. Agmt. at § 3.2(c)(ii). If a Settlement Class Member received four or more vouchers or cash vouchers under

19

the recall program, that would be deducted from what they could receive under the Settlement, leaving them with no monetary recovery.[22] *Id.* Despite being barred from monetary consideration from the Settlement, that Settlement Class Member will be subject to the release. In essence, the Settlement retroactively applies a release to individuals who (1) did not agree to be bound at the time they participated in the recall program and (2) will receive no monetary recovery under the Settlement. For this reason as well, the release is overly broad, rendering the Settlement unfair.

### G. The Release Divests the FDA From Bringing an Enforcement Action

The release precludes FDA from bringing any sort of enforcement action against Defendant for violations of the FDCA or its regulations as relating to benzene in the Products. Upon entry of final approval, "the Releasing Parties shall be deemed to have released, relinquished, and forever discharged each of the Released Parties from any and all Released Claims." Set. Agmt. § 3.6(a). "Releasing Parties" is defined to include any "entity claiming by, for, on behalf of, or through [Class Members]" and the claims released include actions "brought on behalf of…the United States[.]" *Id.* §§ 1.38, 1.4. "Released Claims" include future claims that "in any way relate[] to conduct occurring on or before December 31, 2021" relating to, *inter alia*, "any of the alleged violations of the Federal Food, Drug, and Cosmetics Act, FDA regulations, or FDA guidelines cited in the complaints in the Actions[.]" *Id.* § 1.36. This includes claims for "injunctive relief…or statutory relief…or any penalties of any type whatsoever[.]" *Id.* § 1.4. This is inappropriate.

## IV. CONCLUSION

For all of the aforementioned reasons, this Court should deny preliminary approval, and solicit bids for leadership as contemplated by the Multidistrict Litigation Act.

---

[22] A Class Member who received three (3) vouchers under the recall program and purchased an additional P&G Aerosol Product during the Class Period for which she has not already received a voucher would be entitled to one additional No Proof-of-Purchase Voucher or No Proof-of-Purchase Payment under the Settlement. Set. Agmt. at § 3.2(c)(iii).

Dated:  July 22, 2022     Respectfully submitted,

           */s/ Ruben Honik*
           Ruben Honik
           **Honik LLC**
           1515 Market Street, Suite 1100
           Philadelphia, PA 19102
           Tel: 267-435-1300
           ruben@honiklaw.com

           *Counsel for Plaintiffs Amselem and Clayton*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 22, 2022, this document was served on all parties of record via email

through the Court's CM/ECF system. A non-redacted version was served separately via email.

By: <u>*/s/ Ruben Honik*_____</u>
Ruben Honik

# EXHIBIT 1



solutions driven by innovation

October 21, 2021

Dear Mark Ragase,

I want to thank you for being a valued customer in what has been very difficult times.  As I am sure you are aware, over the last few months there have been multiple brand-initiated, OTC Aerosol voluntary recalls related to levels of Benzene in finished product.  As a market leader in the space, Voyant has taken the nature of these recalls very seriously and have worked diligently with our vendor base to help find a systemic solution to the potential root cause of the issue.

In certain environments and formula compositions, hydrocarbon propellent has been identified as one potential source. I am happy to communicate that our Procurement Team has been able to secure supply of hydrocarbon propellant that has a guarantee from our source(s) of < 1ppm Benzene.  As of late September, Voyant has been using this hydrocarbon propellent in the manufacturing process for all products manufactured in our facilities.  This has been a seamless transition within our supply chain.  While Voyant has executed this change, we encourage our customers to perform their own internal diligence on their products and reach out with any questions.

Sincerely,

Andrew Davis
SVP, Commercial

708.482.8881
info@voyantbeauty.com

5331 Dansher Road
Countryside, IL 60525

voyantbeauty.com

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

# EXHIBIT 2



**The Procter & Gamble Company**
One P&G Plaza
Cincinnati, OH 45202

---

**Voluntary Recall**
**Old Spice and Secret Aerosol Antiperspirant**
**November 22nd, 2021**

| Request | Response | |
|---|---|---|
| **Product name** | Old Spice Pure Sport AP Spray 6oz | |
| | Old Spice Sweat Defense Stronger Swagger AP Spray 3.8oz | |
| | Old Spice Sweat Defense Ultimate Captain AP Spray 3.8oz | |
| | Old Spice Sweat Defense Pure Sport Plus AP Spray 3.8oz | |
| | Secret Aerosol Powder Fresh 4OZ, 6OZ, Twin Pack | |
| | Secret Dry Spray Rose 3.8oz | |
| | Secret Dry Spray Water Lily 3.8oz | |
| | Secret Dry Spray Lavender 3.8oz | |
| | Secret Dry Spray Light Essentials 3.8oz | |
| | Secret Invisible Spray Active Sport 3.8oz | |
| | Secret Outlast Dry Spray Completely Clean 3.8oz | |
| | Secret Outlast Dry Spray Protecting Powder 3.8oz | |
| | Old Spice Pure Sport 10 Holiday Pack | |
| **Model, catalogue, or product order number(s)** | **Product Name** | **Brand Code(s)** |
| | Old Spice Pure Sport AP Spray 6oz | 80272030 |
| | Old Spice Sweat Defense Stronger Swagger AP Spray 3.8oz | 80352553, 80329931, 80340398 |
| | Old Spice Sweat Defense Ultimate Captain AP Spray 3.8oz | 80329938, 80352554 |
| | Old Spice Sweat Defense Pure Sport Plus AP Spray 3.8oz | 80329920, 80352552 |
| | Secret Aerosol Powder Fresh 4OZ | 80341038 |
| | Secret Aerosol Powder Fresh 6OZ | 80261770 |
| | Secret Aerosol Powder Fresh Twins Pack | 80354662 |
| | Secret Dry Spray Rose 3.8oz | 80329960 |
| | Secret Dry Spray Water Lily 3.8oz | 80329961, 80347535 |
| | Secret Dry Spray Lavender 3.8oz | 80329957 |
| | Secret Dry Spray Light Essentials 3.8oz | 80329928 |
| | Secret Invisible Spray Active Sport 3.8oz | 80316330 |
| | Secret Outlast Dry Spray Completely Clean /3.8oz | 80329913 |
| | Secret Outlast Dry Spray Protecting Powder /3.8oz | 80329914 |
| | Old Spice Pure Sport 10 Holiday Pack containing Old Spice Pure Sport AP Spray 6oz | 80364346 |

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

PG00000335

**Confidential - Not for Public Disclosure**

| | |
|---|---|
| **Product image** |  |
| **Description of the product** | **Antiperspirant:**<br>• Uses<br>   o Reduces Underarm Wetness<br>**Packaging:**<br>• Primary: Aerosol Can<br>• Multi-packs include outer carton |
| **Product Labeling** | See Labeling **Appendix 1** |
| **NDC Number** | **NDC**: 37000-199-60, 69423-386-10, 69423-385-10, 69423-387-10, 37000-134-11, 37000-134-17, 69423-380-10, 69423-381-10, 69423-383-10, 69423-382-10, 69423-220-10, 69423-384-10, 69423-478-10, 37000-134-01, 69423-590-01, 69423-387-01, 37000-134-01<br><br>OTC Drug<br><br>23.0% aluminum chlorohydrate (anhydrous) Old Spice Pure Sport AP Spray 37000-199-60<br>24.0% aluminum chlorohydrate (anhydrous) Secret Aerosol Powder Fresh 37000-134-17<br>23.5% aluminum chlorohydrate (anhydrous) All other products<br><br>Route of Administration: Topical Underarm |
| **CODES (Production Identification Numbers).** | The shelf life of the products in scope of recall is 2 years. Retailers will clear their shelves of ALL consumer units in scope, beginning November 22, 2019 through September 30, 2021. All products manufactured beginning October 1, 2021, are in P&G's control and on hold. Since each of these products has a unique UPC code, recording individual lot codes is not required since all products are being recalled because they fall within the 2-year shelf life. Percent reconciliation will be based on the UPC code.<br><br>Products in scope will not be re-introduced into market. The business actions taken to ensure this are as follows:<br>   1. Temporary Stop Sell<br>   2. Discontinue a subset of products based on prior business plans (see Appendix 2)<br><br>For list of products in scope with NDC#, Brand Code, and UPC **See Appendix 2** |

2

**Confidential - Not for Public Disclosure**

| | Lot coding follows the sequence XYYYZZLL where: |
|---|---|
| | • X is the Year of Production |
| | • YYY is the Julian Date |
| | • ZZ Designates the Production Location |
| | • LL indicates on what production line the product was produced. |
| **Expiration date(s) or use-by date(s) or expected shelf life of product.** | This product is coded with a 24-month expiry. |

| | Product Name | UPC Code |
|---|---|---|
| **UPC codes** | Old Spice Pure Sport AP Spray 6oz | 12044001912 |
| | Old Spice Sweat Defense Stronger Swagger AP Spray 3.8oz | 37000730347 12044044759 |
| | Old Spice Sweat Defense Ultimate Captain AP Spray 3.8oz | 37000749479 |
| | Old Spice Sweat Defense Pure Sport Plus AP Spray 3.8oz | 37000729747 |
| | Secret Aerosol Powder Fresh 4OZ 6OZ | 37000711094 37000711087 |
| | Secret Aerosol Powder Fresh Twins Pack | 37000586906 |
| | Secret Dry Spray Rose 3.8oz | 37000798842 |
| | Secret Dry Spray Water Lily 3.8oz | 37000729914 37000723721 |
| | Secret Dry Spray Lavender 3.8oz | 37000729860 |
| | Secret Dry Spray Light Essentials 3.8oz | 37000729921 |
| | Secret Invisible Spray Active Sport 3.8oz | 37000747666 |
| | Secret Outlast Dry Spray Completely Clean 3.8oz | 37000747642 |
| | Secret Outlast Dry Spray Protecting Powder 3.8oz | 37000747727 |
| | Old Spice Pure Sport 10 Holiday Pack | 12044048535 |

| | |
|---|---|
| **RECALLING FIRM.** | The Procter & Gamble Company One P&G Plaza Cincinnati, OH 45202 |
| | **FDA Correspondent** Espe Troyano, PhD; Vice President, Beauty, Global Product Stewardship 8700 Mason Montgomery Road Mason, OH 45040 Phone: 513-627-5300 troyano.m@pg.com |
| | **Quality Assurance Leader** Pamela Schofield, PhD; Senior Vice President, Global Quality Assurance 8700 Mason Montgomery Road Mason, OH 45040 Phone: 513-652-5419 |

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Confidential - Not for Public Disclosure

| | |
|---|---|
| | schofield.pj@pg.com<br><br>**P&G Beauty CEO**<br>Alex Keith<br>P&G Intl Operations SA<br>Geneva Business Center<br>Phone: +41 58 004 8930<br>keith.ra@pg.com |
| **MANUFACTURER.** | Registered Office<br>Voyant Beauty<br>6250 North River Rd, Suite 6000<br>Rosemont, IL, 60018<br><br>Voyant Danville Plant<br>1 West Hegeler Lane<br>Danville, IL, 61832<br><br>DUNS 848647657<br>FEI # 1451271 |
| **IDENTIFY THE FIRM RESPONSIBLE FOR THE VIOLATION/PRODUCT PROBLEM.** | The Procter & Gamble Company<br>One P&G Plaza<br>Cincinnati, OH 45202 |
| **REASON FOR THE RECALL AND INVESTIGATION** | <u>WHY your firm decided to recall the product(s).</u><br>Detection of benzene in product.<br><br><u>How and when did your firm DISCOVER THE REASON for recall</u><br>Third-party testing described in a Citizen Petition filed with FDA on November 04, 2021, alleged presence of benzene in certain spray antiperspirant and deodorant products, including some products distributed by P&G.<br><br>**INVESTIGATION**<br>Timeline of company events: |

| Date | Action |
|---|---|
| November 4, 2021 | Following the report by a third party, began formal investigation, stopped all production of products in scope |
| November 5, 2021 | Determined that all P&G antiperspirant products listed in the Citizen Petition were manufactured at the Danville, IL contract manufacturing location, under the parent company of Voyant Beauty. Engaged with Voyant Beauty to obtain retain samples for technical investigation, and ongoing exchange of information to inform investigation |
| November 5, 2021 | Initiated testing of products in scope, investigation is ongoing |
| November 11 & 17, 2021 | P&G leadership met with Voyant leadership to gather further data to augment investigation |

4

Confidential - Not for Public Disclosure

| | |
|---|---|
| | **What is the ROOT CAUSE of the reason for recall?**<br>Based on investigation to date, root cause identified as hydrocarbon propellants (isobutane or butane) used by contract manufacturer (Aerosols Danville, Inc. dba Voyant Beauty, Danville, IL, FEI # 1451271) ("Voyant"), which detected the presence of benzene in the finished spray products. P&G has now analyzed 127 unique cans of product which were produced between August of 2019 and November 2, 2021, which thus far confirms the hypothesis that propellants used by Voyant were the root cause.  Using the attached protocol (Appendix 3), the amount of benzene detected in finished products ranges from below the level of quantitation (<0.1 ppm) to 24 ppm during this time period. (Appendix 4)<br><br>**Is the root cause of the problem related to:**<br>      (i) **STERILITY** deficiency: YES [ ] NO [ X ]<br>      (ii) **PACKAGING** deficiency: YES [ ] NO [ X ]<br><br>**What type of ILLNESS or INJURY may be caused by the problem?**<br>Benzene is classified as a human carcinogen, a substance that could potentially cause cancer depending on the level and duration of exposure.  Our internal human health risk assessment indicates that the levels of benzene identified would not be expected to cause adverse health consequences (i.e., a class III recall). However, we are conducting the recall to the consumer level out of an abundance of caution.<br><br>**What is the TOTAL number of reports of ILLNESS or INJURY COMPLAINTS received regarding recall product?**<br>No illness or injury complaints associated with benzene received to date.<br><br>**What is the TOTAL number of reports of PRODUCT DEFECT COMPLAINTS received regarding the recall product?**<br>No product defect complaints associated with benzene received to date.<br><br>**Corrective measures taken to PREVENT SIMILAR OCCURRENCE of the problem.**<br>As soon as P&G learned of this issue, we immediately placed product on hold and began working with Voyant to investigate the presence of benzene in our products. P&G will ensure that any future products are manufactured in compliance with relevant CGMP requirements. |
| **HEALTH HAZARD EVALUATION** | **See Appendix 5** |
| **VOLUME OF PRODUCT TO BE RECALLED.** | The total volume of products manufactured in the 2-year recall window is 17.2 million consumer units.<br><br>The volume of product to be recalled spans 19 retailers, with 1.1 million consumer units on hand. Recall at customer level will be initiated to collect product within customer control.<br><br>**See Appendix 6**<br><br>The volume of product to be recalled that is within P&G's control, 1.9 million consumer units. All product in P&G control has been placed on hold effective 11/10/21 and product produced prior to 10/1/21 will be destroyed. |

5

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

PG00000339

**Confidential - Not for Public Disclosure**

| | |
|---|---|
| | **See Appendix 7**<br><br>Estimate 1.0 million units in consumer hands in the two year recall period, based on P&G's internal knowledge of AP spray consumer habits and practice data. Consumers will be notified via press release to dispose of recalled product.<br><br>Product Reconciliation (all in **millions** of consumer units) |

Product Reconciliation (all in **millions** of consumer units)

| | |
|---|---|
| Total of products manufactured in 2yr recall window | 17.2 |
| Retailer inventory | 1.1 |
| In P&G control, on hold | 1.9 |
| Estimate of what is in consumers' hands (based on P&G internal AP spray consumer habits and practice data) | 1.0 |

| | |
|---|---|
| **DISTRIBUTION PATTERN.** | **Markets of Sale**: United States, Puerto Rico, & Canada<br><br>**Sold via distributors** in the countries listed below:<br><br>**Central and South America**<br>US Virgin Islands, Trinidad, Peru, Saint Marteen, Bahamas, Costa Rica, Guatemala, Honduras, Panama, Belize, Santa Lucia, Aruba, Dominican Republic, Guyana<br><br>**Asia:**<br>Guam, Northern Mariana Islands (Saipan), American Samoa, Bhutan, Timor-Leste, Maldives Fiji<br><br>Product is **not** under a government contract but is being sold to military bases for sale in commissaries.<br><br>Product was **not** sold to any federal, state, or local agency.<br><br>Product sold in Retail stores, on-line outlets, and Distributors for Global Markets - please see appendix documents on last page<br>    • **Appendix 6** - Retailer product inventory<br>    • **Appendix 8** – Latin America Distributors<br>    • **Appendix 9** - Asia Distributors<br><br>The Appendix documents below also contain the volume of inventory outside of P&G's possession. Note, 1 case = 12 consumer units. |
| **RECALL STRATEGY.** | **Consumer level voluntary recall**<br><br>P&G will send a Customer Letter via e-mail informing customers of the issue and noting that an approved third-party agency (Inmar Reverse Logistics) specializing in recall management will execute the voluntary recall. Additionally, Inmar Reverse Logistics will contact each customer to execute the voluntary recall and confirm product has been returned or disposed of properly. Customers and consumers will receive specific instructions for the recall. Product replacement and refund will be offered as appropriate. |

6

PG00000340

**Confidential - Not for Public Disclosure**

|  | Recall will begin 11/22/21. Draft Customer Communication – **See Appendix 10** Draft Press Release – **See Appendix 11** |
|---|---|

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

PG00000341

# EXHIBIT 3

Redacted



Redacted

Redacted

Redacted

Redacted

Redacted

Redacted



Redacted

Redacted



# EXHIBIT 4

Redacted

Redacted

Redacted

# EXHIBIT 5

# RE: Documents

From:  Soukup, Andrew <asoukup@cov.com>
  To:  Ryan Casey <ryan@rcaseylaw.com>
  Cc:  Conlee Whiteley <c.whiteley@kanner-law.com>, ruben@honiklaw.com <ruben@honiklaw.com>

Ryan:

In response to your questions below:

- My understanding is that P&G did not use a script for when a consumer requested fewer than 5 coupons. The call center representative assumed any such request was legitimate, and processed it accordingly.
- My understanding is that, for customers that requested a cash payment instead of a coupon, the value of the cash payment generally matched the value of the coupon P&G offered for that product. For consumers that provided a proof of purchase showing that they paid to purchase the product, cash payment would instead equal the amount reflected on the proof of purchase.
- There was no additional substantive step or requirement after the "Contact Details" page. After a customer provided their contact info, they would see a screen shot that thanked the customer for contacting P&G and contained a case reference number. An example of that reference number is below.

Thank you for contacting us.
Your Case Reference is: 19286568

Sincerely,

**Andrew Soukup**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5066 | asoukup@cov.com
www.cov.com

## COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system.

Thank you for your cooperation.

---

**From:** Ryan Casey <ryan@rcaseylaw.com>
**Sent:** Thursday, June 30, 2022 2:02 PM
**To:** Soukup, Andrew <asoukup@cov.com>
**Cc:** Conlee Whiteley <c.whiteley@kanner-law.com>; ruben@honiklaw.com
**Subject:** Documents

[EXTERNAL]

Andrew,

Thank you for your time today. As a follow up, we are asking that P&G supplement its production to provide the complete versions of two produced documents.

First, PG 545-547 appears to be part of the telephone script governing reimbursement / vouchers. We only received the portion relating to a request for more than 5 products. Please provide the '5 or less' portion. Insofar as it is not reflected in the full version of the document, please provide the protocol for determining the amount of cash reimbursements.

I did not mention on call, but can you also provide the complete version of the "Webforms" document (PG 520-544). For each product, the online reimbursement process in the production concludes at the "Contact Details" page (see, e.g., PG 524), but there is likely a following page where consumers would provide additional information regarding the product and reimbursement requested.

Thanks again.

M. Ryan Casey, Esq.
The Casey Law Firm, LLC
PO Box 4577
Frisco, CO 80443
Tel: (970) 372-6509
Fax: (970) 372-6482
ryan@rcaseylaw.com
*\* Licensed in CO, LA, and OR*

# EXHIBIT 6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Business Use

# Webforms

## Old Spice, Secret, Herbal, Pantene, Waterless, Hair Food

PG000000520

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

PG000000521



CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

PG000000522

SHOP ⌄     MANBOOK ⌄     SCHOOL OF SWAGGER

*Old Spice*

## AEROSOL SPRAY ANTIPERSPIRANT, BELOW DECK AEROSOL SPRAY AND DRY SHAMPOO SPRAY VOLUNTARY RECALL STATEMENT – UNITED STATES

### WHAT YOU NEED TO KNOW:

You may have noticed Old Spice aerosol spray antiperspirants and Below Deck aerosol sprays are not available where you shop. That is because we have made the decision to voluntarily recall aerosol spray antiperspirants, Below Deck aerosol sprays and our previously discontinued dry shampoos.

To request reimbursement for your impacted product, please complete one of the below:



| Aerosol Spray Antiperspirant and Below Deck | Previously Discontinued Dry Shampoo |
| --- | --- |
| If you have 1 product, click here | If you have 1 product, click here |
| If you have 2 products, click here | If you have 2 products, click here |
| If you have 3 products or more, click here | If you have 3 products or more, click here |
| If you have this US product in hand but live in CA, please call 1-888-339-7689 | If you have this US product in hand but live in CA, please call 1-888-674-3631 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Business Use



Before you send your message, we would like to explain how we use your personal information and why it's as important to us as it is to you.

For P&G to be able to help you, we and our trusted service providers may collect your personal details. Your details will be stored for a period of time in line with legal and regulatory requirements depending on the nature of your inquiry.

How we use the details you provide:

To respond to you and send relevant items or information to resolve your inquiry

To follow up with you about the service you receive from us

To report data to regulatory authorities as may be required by law

To identify trends in data that help us improve our products and services

We will not use the details you provide here to send marketing information to you. To read P&G's Privacy Policy please click here.

Agree and Continue

PG00000523

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

Business Use



Our priority is the safety of the millions of people who trust us with their personal care needs. To obtain compensation for your impacted products, please fill out the following information. In order to be compensated for two products, please complete this form in its entirety. Due to mail and shipping delays with the holidays you can expect reimbursement to arrive within 4-6 weeks.

## Contact Details

| *First Name | *Last Name |
|---|---|
| *Email | *Phone |
| e.g JohnSmith@mail.com | |
| *Address Line 1 | Address Line 2 |
| *City/Town | *State/Province |
| *Zip/Postal Code | United States of America |

Submit

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Secret*

**PRODUCTS**   **SWEAT TIPS**   **DISCOVER YOUR SECRET**   **ABOUT**

Use

If you are in the USA and are looking for details about the voluntary recall of specific Secret aerosol antiperspirant spray products, including how to request reimbursement, click here.

If you are in Canada and are looking for details about the voluntary recall of specific Secret aerosol antiperspirant spray products, including how to request reimbursement, click here for English and here for French.

# ALL STRENGTH, NO SWEAT



CERTIFIED
PeTA
Cruelty-Free



PG000000525

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PG00000526

Secret.    PRODUCTS    SWEAT TIPS    DISCOVER YOUR SECRET    ABOUT

## Aerosol Spray Antiperspirant Voluntary Recall Statement - United States

**What You Need to Know:**

You may have noticed Secret aerosol spray antiperspirants are not available where you shop. That is because we have made the decision to voluntarily recall specific aerosol spray antiperspirants.

To request reimbursement for your impacted product, please complete one of the below:

1. If you have 1 product, click here
2. If you have 2 products, click here
3. If you have 3 products or more, click here

**Which Products Were Recalled?**

Below are images of the current product in market, followed by the list of products with names and UPC codes. Please refer to the UPC code if your product looks different.



CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

Business Use



Before you send your message, we would like to explain how we use your personal information and why it's as important to us as it is to you.

For P&G to be able to help you, we and our trusted service providers may collect your personal details. Your details will be stored for a period of time in line with legal and regulatory requirements depending on the nature of your inquiry.

How we use the details you provide:

To respond to you and send relevant items or information to resolve your inquiry

To follow up with you about the service you receive from us

To report data to regulatory authorities as may be required by law

To identify trends in data that help us improve our products and services

We will not use the details you provide here to send marketing information to you. To read P&G's Privacy Policy please click here.

Agree and Continue

PG00000527

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



...ess Use

Our priority is the safety of the millions of people who trust us with their personal care needs. To obtain compensation for your impacted products, please fill out the following information. In order to be compensated for three products, please complete this form in its entirety. Due to mail and shipping delays with the holidays you can expect reimbursement to arrive within 4-6 weeks. If you have more than three products, please fill out a second form. If you have further questions, please call 1-888-339-7689.

## Contact Details

| *First Name | *Last Name |
| --- | --- |
| *Email | *Phone |

e.g JohnSmith@mail.com

| *Address Line 1 | Address Line 2 |
| --- | --- |
| *City/Town | *State/Province |
| *Zip/Postal Code | United States of America |

Submit

PG00000528

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



Select a country

Live Chat  Contact us  ...ness Use

OUR PRODUCTS  OUR INGREDIENTS  OUR PHILOSOPHY  OUR KEW PARTNERSHIP  ARTICLES

If you are in the USA and are looking for details about the voluntary recall of Herbal Essences aerosol dry shampoo spray products, including how to request reimbursement, click here.

## Plant Power in Your Shower with our Shampoos and Conditioners

Our Herbal Essences bio:renew shampoos and conditioners contain real botanicals, identified and certified by the Royal Botanic Gardens, Kew, one the world's leading authorities on plants. Discover our hair care collections designed to relieve any common hair concerns and uncap an experience unlike any other.

**Discover Our Products**

 1/2 

PG000000529

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Business Use



PG000000530

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

Business Use



Before you send your message, we would like to explain how we use your personal information and why it's as important to us as it is to you.

For P&G to be able to help you, we and our trusted service providers may collect your personal details. Your details will be stored for a period of time in line with legal and regulatory requirements depending on the nature of your inquiry.

How we use the details you provide:

To respond to you and send relevant items or information to resolve your inquiry

To follow up with you about the service you receive from us

To report data to regulatory authorities as may be required by law

To identify trends in data that help us improve our products and services

We will not use the details you provide here to send marketing information to you. To read P&G's Privacy Policy please click here.

Agree and Continue

PG000000531

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

ness Use



Our priority is the safety of the millions of people who trust us with their hair care needs. To obtain reimbursement for your impacted products, please fill out the following information. In order to be reimbursed for three products, please complete this form in its entirety. If you have more than three products, please fill out a second form to obtain compensation for up to 5 products. If you have 6 or more products or further questions, please call 1- 888-674-3631. Be advised that in order to process 6 or more products for reimbursement, we will need proof of purchase. Be sure to have documentation ready in hand when speaking with an agent. Due to mail and shipping delays with the holidays you can expect reimbursement to arrive within 4-6 weeks.

## Contact Details

| *First Name | *Last Name |
|---|---|
| *Email | *Phone |

e.g JohnSmith@mail.com

| *Address Line 1 | Address Line 2 |
|---|---|
| *City/Town | *State/Province |
| *Zip/Postal Code | United States of America ⬍ |

Submit

PG000000532

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PG00000533

Home   Our Story   Shop   Collection Stories   Hair Advisor   Blog

# PANTENE

EN-US ∨

If you are in the USA and are looking for details about the voluntary recall of Pantene aerosol dry shampoo spray and dry conditioner spray products, including how to request reimbursement, **click here**.

If you are in Canada and are looking for details about the voluntary recall of Pantene aerosol dry shampoo spray and dry conditioner spray products, including how to request reimbursement, **click here for English** and **here for French**.



# GENERATION BEAUTY
*collection*

Discover Pro-V Generation Beauty, a tailored blend of nutrients with three new solutions for you, based on your hair's needs at every age. Explore the collections!

**LEARN MORE**

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

Business Use

## How do I request reimbursement?

To request reimbursement for your impacted product, please complete one of the below:

1. If you have 1 product, click **here**

2. If you have 2 products, click **here**

3. If you have 3 or more products, click **here**

PG00000534

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Business Use

# PANTENE

Before you send your message, we would like to explain how we use your personal information and why it's as important to us as it is to you.

For P&G to be able to help you, we and our trusted service providers may collect your personal details. Your details will be stored for a period of time in line with legal and regulatory requirements depending on the nature of your inquiry.

How we use the details you provide:

To respond to you and send relevant items or information to resolve your inquiry

To follow up with you about the service you receive from us

To report data to regulatory authorities as may be required by law

To identify trends in data that help us improve our products and services

We will not use the details you provide here to send marketing information to you. To read P&G's Privacy Policy please click here.

Agree and Continue

PG000000535

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

PG00000536

Business Use



# PANTENE

Our priority is the safety of the millions of people who trust us with their hair care needs. To obtain reimbursement for your impacted products, please fill out the following information. In order to be reimbursed for three products, please complete this form in its entirety. Due to mail and shipping delays with the holidays you can expect reimbursement to arrive within 4-6 weeks. If you have more than three products, please fill out a second form to obtain compensation for up to 5 products. If you have 6 or more products or further questions, please call 1- 888-674-3631. Be advised to process 6 or more product reimbursement, we will need proof of purchase. Be sure to have documentation ready in hand when speaking with an agent.

## Contact Details

| *First Name | *Last Name |
|---|---|
| *Email | *Phone |
| e.g JohnSmith@mail.com | |
| *Address Line 1 | Address Line 2 |
| *City/Town | *State/Province |
| *Zip/Postal Code | United States of America |

Submit

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER



PG00000537

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

Business Use

# How do I request reimbursement?

To request reimbursement for your impacted product, please complete one of the below:

1. If you have 1 product, click here
2. If you have 2 products, click here
3. If you have 3 or more products, click here
4. If you have this US product in hand but live in CA, please call 1-888-674-3631

PG00000538

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Business Use



Before you send your message, we would like to explain how we use your personal information and why it's as important to us as it is to you.

For P&G to be able to help you, we and our trusted service providers may collect your personal details. Your details will be stored for a period of time in line with legal and regulatory requirements depending on the nature of your inquiry.

How we use the details you provide:
To respond to you and send relevant items or information to resolve your inquiry
To follow up with you about the service you receive from us
To report data to regulatory authorities as may be required by law
To identify trends in data that help us improve our products and services
We will not use the details you provide here to send marketing information to you. To read P&G's Privacy Policy please click here.

Agree and Continue

PG00000539

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER



Our priority is the safety of the millions of people who trust us with their hair care needs. To obtain reimbursement for your impacted products, please fill out the following information. In order to be reimbursed for three products, please complete this form in its entirety. If you have more than three products, please fill out a second form to obtain compensation for up to 5 products. If you have 6 or more products or further questions, please call 1- 888-674-3631. Be advised that in order to process 6 or more products for reimbursement, we will need proof of purchase. Be sure to have documentation ready in hand when speaking with an agent. Due to mail and shipping delays with the holidays you can expect reimbursement to arrive within 4-6 weeks.

## Contact Details

| *First Name | *Last Name |
| *Email | *Phone |

e.g JohnSmith@mail.com

| *Address Line 1 | Address Line 2 |
| *City/Town | *State/Province |
| *Zip/Postal Code | United States of America ⬍ |

Submit

PG000000540

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

PG000000541

OUR PRODUCTS | OUR COLLECTIONS



ARTICLES | ABOUT US

ness Use

For more information about the voluntary recall of Hair Food aerosol dry shampoo spray products, including how to request reimbursement, please click here.



# NOURISH YOUR HAIR LIKE YOU NOURISH YOUR BODY.

DISCOVER OUR PRODUCTS





## OUR MISSION

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

Business Use

**How do I request reimbursement?**

To request reimbursement for your impacted product, please complete one of the below:

1.   If you have 1 product, click here

2.   If you have 2 products, click here

3.   If you have 3 or more products, click here

4.   If you have this US product in hand but live in CA, please call 1- 888-674-3631

PG000000542

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

Business Use

# hair food

Before you send your message, we would like to explain how we use your personal information and why it's as important to us as it is to you.

For P&G to be able to help you, we and our trusted service providers may collect your personal details. Your details will be stored for a period of time in line with legal and regulatory requirements depending on the nature of your inquiry.

How we use the details you provide:

To respond to you and send relevant items or information to resolve your inquiry

To follow up with you about the service you receive from us

To report data to regulatory authorities as may be required by law

To identify trends in data that help us improve our products and services

We will not use the details you provide here to send marketing information to you. To read P&G's Privacy Policy please click here.

Agree and Continue

PG000000543

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1ess Use

# hair food

Our priority is the safety of the millions of people who trust us with their hair care needs. To obtain reimbursement for your impacted products, please fill out the following information. In order to be reimbursed for three products, please complete this form in its entirety. If you have more than three products, please fill out a second form to obtain compensation for up to 5 products. If you have 6 or more products or further questions, please call 1-888-674-3631. Be advised that in order to process 6 or more products for reimbursement, we will need proof of purchase. Be sure to have documentation ready in hand when speaking with an agent. Due to mail and shipping delays with the holidays you can expect reimbursement to arrive within 4-5 weeks.

## Contact Details

| | |
|---|---|
| *First Name | *Last Name |
| *Email | *Phone |
| e.g JohnSmith@mail.com | |
| *Address Line 1 | Address Line 2 |
| *City/Town | *State/Province |
| *Zip/Postal Code | United States of America |

Submit

PG000000544

# EXHIBIT 7

# P&G - Updated Recall Statistics

**From:** "Heath, Amy" <aheath@cov.com>
**To:** "Wayne, Richard S." <rswayne@strausstroy.com>, Gary Klinger <gklinger@milberg.com>
**Cc:** "Soukup, Andrew" <asoukup@cov.com>, "Liu, Henry" <hliu@cov.com>
**Date:** Tue, 07 Jun 2022 19:18:40 +0000

Gary and Rick,

As you requested, we write to provide updated information about the status of P&G's recall programs. Through the end of May, P&G has provided to U.S. consumers a total 482,758 vouchers totaling $3,594,951.00 in value. P&G also has provided to U.S. consumers a total of 995 cash refunds worth $25,080.84.

Best,
Amy

**Amy Heath**
Pronouns: She/Her/Hers

Covington & Burling LLP
Salesforce Tower, 415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T +1 415 591 7030 | aheath@cov.com
www.cov.com

## COVINGTON

# EXHIBIT 8

**From:** Ruben Honik <ruben@honiklaw.com>
**Date:** Friday, January 28, 2022 at 12:58 PM
**To:** Soukup, Andrew <asoukup@cov.com>
**Subject:** P&G -- heads up

Andrew,

It has been brought to my attention that a couple of plaintiffs lawyers, notably Laukaitis at Shub and Klinger at Mason Lietz have been agitating for an early mediation and engagement with your client concerning resolution of this litigation.

The vast majority of the remaining plaintiffs who are aligned with me and my team are unalterably opposed to this end around. While we would welcome, at the appropriate time and place, an opportunity to discuss a pathway to resolution with your client, we are not on board with any effort that these rogue plaintiffs are attempting.

As I mentioned to you early on in this litigation, we will not countenance an Aylstock style sunscreen resolution in this case.

Ruben Honik
Honik LLC
1515 Market Street
Suite 1100
Philadelphia, PA 19102
ruben@honiklaw.com
www.honiklaw.com
O: 267 435 1300
M: 215 327 9166

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

In re: Procter & Gamble Aerosol Products     Case No. 2:22-md-3025
Marketing and Sales Practices Litigation     Judge Michael H. Watson
                                                        Magistrate Judge Chelsey Vascura

This document relates to: ALL CASES

## <u>DECLARATION OF RUBEN HONIK, ESQ.</u>

1.       My name is Ruben Honik. I am lead counsel for plaintiffs in *Amselem v. The Procter & Gamble Co.*, No. 0-21-cv-62285 (S.D. Fla.) (originally captioned as *Bryski v. The Procter & Gamble Co.* when filed on November 4, 2021), and *Clayton v. The Procter & Gamble Co.*, No. 1:21-cv-24426 (S.D. Fla.). I am over 18 years of age. This declaration is based on my personal knowledge and I can competently testify to the matters set forth herein.

2.       On December 15, 2021, I had a teleconference with Andrew Soukup, Esq., lead counsel for Defendant The Procter & Gamble Co. ("P&G"). We discussed that Mr. Soukup had been in communication with other plaintiffs' counsel, some of whom suggested early resolution of all related matters. However, we discussed, and Mr. Soukup did not disagree, that early resolution might be premature prior to a decision by the JPML and appointment of leadership on the plaintiffs' side. I was assured there would be no 'end-around' deal or negotiating without everyone being informed.

3.       On December 17, 2021, I undertook reaching out to all known plaintiffs' counsel in known cases to informally coordinate a plaintiff-side approach to establish a unified front against any effort by Defendant to pursue a 'fire sale' early settlement.

4.       Following initial reach out efforts, my office sent a Zoom teleconference invitation to all known plaintiffs' counsel on December 23, 2022. Invitees included counsel for SPs and MSPs alike. The invitation list included dozens of plaintiffs' counsel, including the following plaintiffs' counsel: myself, David Stanoch, Conlee Whiteley, Layne Hilton, Gillian Wade, Sara Avila, Marc Castaneda, Peter Samberg, Andrew Obergfell, Sara Westcott, Charles Schaffer, Yitzhak Levin, Paul Geske, Ryan Casey, Marlene Goldenberg, Nick Suciu, Jen Czeisler, Richard Wayne, Joseph Braun, Gary Klinger, Michael Reese, Kevin Laukaitis, Jeffrey Levine, Amanda Ciulla, Carl Post, Ian Sloss Carl Malmstrom, Courtney Maccarone, Gary Mason, Alex Strauss, George Granade, Virginia Whitener, Russell Busch, Sue Nam, Charles Moore, Jason Sultzer,

Joseph Lupari, Daniel Markowitz, Mindy Dolgoff, David Magagna, Steven Bloch, Joshua Cohen, Mark Reich, James Rosenthal, Pamela Berman, Steve Wolterman, Michael Gabrielli, Jonathan Shub, Carasusana Wall, Michelle Kranz.  The invitation was forwarded on December 29, 2022 to the following additional plaintiffs' counsel: Rick Paul, Sean Cooper, Bill Markovits, Terence Coates, and Christopher Stock.   Both invitations asked recipients to forward to other plaintiffs' counsel with cases.

5.    The Zoom teleconference took place on December 30, 2022 with numerous participants.

6.    The discussion on the Zoom teleconference suggested two 'groups' of plaintiffs' attorneys taking shape, one coalescing around transfer to the Southern District of Florida, the other around transfer to the Southern District of Ohio.

7.    Further, the discussion on the Zoom teleconference suggested Defendant's counsel had reached out to informal representatives of each plaintiffs' group to say the other group wanted to discuss early resolution.  I discussed on the Zoom teleconference that my prior December 15 call with Defendant's counsel suggested the opposite, i.e., that Defendant believe any settlement prior to transfer and appointment of plaintiff-side leadership would be premature.

8.    At no time during the Zoom teleconference did any members of the Mediation counsel (as defined in the proposed settlement agreement) disclose any substantive settlement talks or mediation plans.

9.    In late January 2022, it came to me that certain plaintiffs' counsel seeking transfer to Ohio might have been agitating for a quick settlement with Defendant.  To that end, I emailed defense counsel on January 28, 2022 about this.

10.    My office hosted a follow-up Zoom teleconference on February 7, 2022, to which all counsel identified above, as well as any others subsequently identified, were invited.  Among other things, the matter of a potential quick resolution was discussed.  During this Zoom teleconference, attended by plaintiffs' counsel for SPs and NSPs alike, there was no indication of any imminent settlement or mediation plans.

11.    Aside from the two Zoom teleconferences, I initiated multiple group calls including calls with plaintiffs' counsel for the Florida and Ohio in an effort to facilitate communication and a good working relationship.  A primary concern of mine was avoiding a 'pick-off' settlement whereby Defendant could 'choose' between competing groups with whom to settle.

12.    At no point during the two Zoom teleconferences, or during any of my other communications with liaisons for the group of plaintiffs' counsel favoring Ohio for transfer, was it suggested by me that transfer to Florida meant exclusion from potential leadership for the former.

13.    At no point to the apparent March 28, 2022 mediation did Plaintiffs' Mediation Counsel reach out to me or, to my knowledge, other plaintiffs' counsel representing plaintiffs in

other pending cases (including those pending in the Southern District of Florida), to participate in the mediation.

14.     The accompanying exhibits submitted contemporaneously herewith are true and correct copies of the materials.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 22 July 2022


Signed: _____
        Ruben Honik

# EXHIBIT 10

*Privileged & Confidential*
*Attorney Work Product / Draft*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **In re: Procter & Gamble Aerosol Products Marketing and Sales Practices Litigation** | Case No. 2:22-md-3025 Judge Michael H. Watson Magistrate Judge Chelsey Vascura |

**This document relates to: ALL CASES**

### DECLARATION OF PHILIP RUSS

1. My name is Philip Russ. Counsel for certain plaintiffs in this matter have asked that I evaluate the proposed class settlement in this matter with respect to current FDA guidance on the presence of certain impurities.

2. The materials I have reviewed for purposes of this declaration are set forth in the body and footnotes herein.

3. I reserve the right to modify this declaration if and when appropriate, including if additional information is later made available to me.

4. A copy of my current curriculum vitae is available on request.

5. I am the owner and president of Innovative Consultants GXP (IcGXP), which provides a range of regulatory compliance and quality assurance services to clients in the pharmaceutical, medical device and biologics industry. I have 27 years of experience in these industries, focusing on the regulatory compliance aspects of developing and managing Quality Management Systems, as well as regulatory application and manufacturing process and facility cGMP compliance.

6. I routinely evaluate qualitative and quantitative data and objective evidence for support of manufacturing processes and regulatory submissions. I also have a breadth of experience performing and/or coordinating compliance audits involving 21 CFR 210 and 211[1], 21

---

[1] US Code of Federal Regulations, Title 21 – Food and Drugs, Chapter 1 – Food and Drug Administration Department of Health and Human Services, Subchapter C – Drugs: General, Parts 210 and 211 - Current Good Manufacturing Practice for the Manufacture, Processing, Packing, or Holding of Drugs.

*Privileged & Confidential*
*Attorney Work Product / Draft*

CFR 820[2], European drug regulations[3] and other worldwide regional drug and medical device regulations.

7.      The projects I have worked on include providing expert counsel in quality systems for early development projects; pioneering drug/medical device/drug combination quality systems and cGMP compliance initiatives; designing statistical and attribute analysis programs for manufacturing processes; continuous process improvement, compliance auditing, supplier quality management, product technology transfer and validation support; statistical process controls strategies and quality assurance (QA) expertise for product development activities for both medical device and drug products.

8.      I have worked for drug manufacturing firms as a permanent quality and cGMP compliance leader and as an industry expert management consultant in cGMP compliance.  I have worked with companies encountering product quality issues resulting in broad recalls of products and have an intimate knowledge of how firms function when faced with these critical regulatory compliance problems with FDA and other drug regulatory enforcement agencies around the world.

9.      I understand from discussions with counsel and reviewing the Notice of Proposed Class Action Settlement filed in this matter that this litigation relates to the presence of benzene in certain aerosol products manufactured, distributed, or sold by the Proctor & Gamble Company ("P&G").

10.      The proposed settlement provides that the Proctor & Gamble Company ("P&G") will conduct batch testing of the finished P&G Aerosol Products to ensure that product released into the market does not contain benzene at levels exceeding 1 ppm. [4]

11.      Current FDA guidance, entitled *Guidance for Industry, Q3C Impurities: Residual Solvents*, avail. at https://www.fda.gov/media/71736/download ("Q3C Guidance") provides that "Solvents in Class 1 (Table 1; see companion document) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect." *Id.* at 6.

12.      The guidance defines benzene as a Class 1 substance. *See* FDA, *Q3C – Tables and List, Guidance for Industry*, avail. at https://www.fda.gov/media/71737/download ("Guidance Tables"), at 5.

---

[2] US Code of Federal Regulations, Title 21 – Food and Drugs, Chapter 1 – Food and Drug Administration Department of Health and Human Services, Subchapter H – Medical Devices, Part 820 – Quality System Regulation.

[3] EudraLex - Volume 4 - Good Manufacturing Practice (GMP) Guidelines.

[4] *See* Class Action Settlement Agreement and Release, Case No. 2:22-md-030225-MHW-CMV (ECF 23-1), at p.16.

*Privileged & Confidential*
*Attorney Work Product / Draft*

13.     The guidance further provides that Class I solvents, "if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1." Q3C Guidance at 6.  For benzene, the limit would be 2 ppm if the use of benzene "is unavoidable." Guidance Tables at 5.

14.     As there are equivalent aerosol products that are reported by the FDA not to contain any benzene, it does not appear that benzene is "unavoidable."

15.     The proposed settlement, in suggesting that P&G will test certain aerosol products for "the presence of benzene at 1 ppm or more," does not speak to the guidance set forth above about no amount of benzene being present unless "unavoidable."

16.     As such, the '1 ppm standard' contemplated in the Settlement Agreement is in conflict with—and represents a dilution of—the FDA Q3C Guidance for Industry.

17.     FDA Guidance documents are widely relied on by manufacturers and distributors of drug products. They represent the agency's current thinking on a subject, and the proposed standards represent the scientific consensus in the relevant scientific community. *See* Q3C Guidance at 1 (discussing development of Q3C Guidance within the Expert Working Group of the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use).

18.     The proposed settlement agreement in effect substitutes a more lenient standard for one proposed in an FDA Guidance document.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 21 July 2022

Signed:_ ~~signature~~ __

Philip Russ