**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**In re Procter & Gamble Aerosol Products
Marketing and Sales Practices Litigation**

**This document relates to: <u>ALL CASES</u>**

Case No. 2:22-md-3025

Judge Michael H. Watson

Magistrate Judge Chelsey Vascura

**THE PROCTER & GAMBLE COMPANY'S RESPONSE TO
PLAINTIFFS MIRIAM AMSELEM AND SHERI CLAYTON'S OPPOSITION TO
MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION............................................................................................................ 1

BACKGROUND............................................................................................................. 2

    A.    P&G's Comprehensive Investigation into Benzene Contamination. ................... 2

    B.    The Parties' Settlement Negotiations. ................................................. 4

    C.    P&G Shares Information About The Settlement With Objectors' Counsel, Who Did Not Raise Any Concerns About the Settlement................................... 5

PROCEDURAL STANDARD............................................................................................. 5

ARGUMENT ................................................................................................................ 6

I.    THE SETTLEMENT IS FAIR BASED ON THE MERITS OF THE CLAIMS. ............. 6

II.    OBJECTORS' CRITICISMS OF THE SETTLEMENT LACK MERIT. ....................... 9

    A.    The Settlement is the Product of Arm's Length Negotiations. ............................. 9

    B.    The Monetary Compensation Provided to the Class is Fair. ...............................13

    C.    The Settlement Agreement's Injunctive Relief Imposes More Stringent Requirements as Compared to Current FDA Guidance. ....................................16

    D.    The Release in the Settlement Agreement is Appropriate...................................17

        1.    The release is not overly broad. ...........................................................18

        2.    The release appropriately bars claims from those who have been made whole by P&G's recall program. ...................................................19

        3.    The release does not preclude the FDA from enforcement actions. .........20

CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Amos v. PPG Indus., Inc.*,
   2015 WL 4881459 (S.D. Ohio Aug. 13, 2015) ................................................. 13

*Bailey v. Verso Corp.*,
   337 F.R.D. 500 (S.D. Ohio 2021) ............................................................... 6, 17

*Blunt v. Lower Merion Sch. Dist.*,
   767 F.3d 247 (3rd Cir. 2014) ...................................................................... 18

*In re Broadwing, Inc.*,
   252 F.R.D. 369 (S.D. Ohio 2006) ............................................................... 14

*Broomfield v. Craft Brew Alliance, Inc.*,
   2020 WL 1972505 (N.D. Cal. 2020) ........................................................... 15

*Chavez v. PVH Corp.*,
   2015 WL 581382 (N.D. Cal. Feb. 11, 2015) ................................................. 19

*Churchill Vill., LLC v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ...................................................................... 14

*David v. American Suzuki Motor Corp.*,
   No. 08-cv-22278 (S.D. Fla. Mar. 26, 2010) ................................................. 19

*Doe One v. CVS Healthcare Corp.*,
   2019 WL 4893834 (S.D. Ohio Oct. 4, 2019) ............................................... 16

*Does 1-2 v. Déjà Vu Servs. Inc.*,
   925 F.3d 886 (6th Cir. 2019) ................................................................ 17, 18

*Echard v. Wells Fargo Bank N.A.*,
   2022 WL 1210321 (S.D. Ohio Apr. 25, 2022) .............................................. 12

*Garner Props. & Mgmt., LLC v. City of Inkster*,
   333 F.R.D. 614 (E.D. Mich. 2020) ................................................................ 6

*Gascho v. Glob. Fitness Holdings, LLC*,
   2013 WL 12354005 (S.D. Ohio Sept. 30, 2013) ........................................... 16

*Gemelas v. Dannon Co.*,
   2010 WL 3703811 (N.D. Ohio Aug. 31, 2010) ............................................ 14

*Halley v. Honeywell Intern., Inc.*,
   861 F.3d 481 (3rd Cir. 2017) ...................................................................... 18

*Herman v. S.C. Nat. Bank*,
    140 F.3d 1413 (11th Cir. 1998) ........................................20

*In re Johnson & Johnson Aerosol Sunscreen Mktg.,*
    *Sales Pracs. and Prods. Liab. Litig.*,
    No. 0:21-md-3015 (S.D. Fla.) ........................................16

*Kritzer v. Safelite Sols., LLC*,
    2012 WL 1945144 (S.D. Ohio May 30, 2012) ........................................6

*Lewis v. Huntington Nat'l Bank*,
    2013 WL 12230882 (S.D. Ohio Mar. 13, 2013) ........................................16

*McAlarnen v. Swift Transp. Co.*,
    2010 WL 365823 (E.D. Pa. Jan. 29, 2010) ........................................20

*In re Packaged Ice Antitrust Litig.*,
    2012 WL 5493613 (E.D. Mich. Nov. 13, 2012) ........................................18

*In re Packaged Ice Antitrust Litig.*,
    2018 WL 4520931 (6th Cir. May 24, 2018) ........................................15

*Pagan v. Abbott Labs., Inc.*,
    287 F.R.D. 139 (E.D.N.Y. 2012) ........................................8

*Parker v. Time Warner Entmt. Co.*,
    239 F.R.D. 318 (E.D.N.Y. 2007) ........................................15

*Pelzer v. Vassalle*,
    655 F. App'x 352 (6th Cir. 2016) ........................................17

*In re Procter & Gamble Aerosol Prods. Mktg. & Sales Pracs. Litig.*,
    MDL No. 3025 (J.P.M.L. Mar. 31, 2022) ........................................11

*In re Rio Hair Naturalizer Prods. Liab. Litig.*,
    1996 WL 780512 (E.D. Mich. Dec. 1996) ........................................19

*In re Samsung Top-load Washing Mach. Mktg., Sales Pracs. & Prod. Liab. Litig.*,
    2020 WL 2616711 (W.D. Okla. May 22, 2020) ........................................8

*Schloegel v. Edgewell Personal Care Co.*,
    2022 WL 808694 (W.D. Mo. Mar. 16, 2022) ........................................7

*Schneider v. Chipotle Mexican Grill, Inc.*,
    2020 WL 511953 (N.D. Cal. Jan. 31, 2020) ........................................18

*Smith v. CSX Transp., Inc.*,
    2015 WL 4389574 (N.D. Ohio June 18, 2015) ........................................15

*In re Telectronics Pacing Sys., Inc.*,
    137 F. Supp. 2d 985 (S.D. Ohio 2001) ...................................................................6

*Treviso v. Nat'l Football Museum, Inc.*,
    2018 WL 4608197 (N.D. Ohio Sept. 25, 2018) ......................................................8

*In re Wendy's Co. S'holder Derivative Action*,
    2020 WL 13169460 (S.D. Ohio Jan. 24, 2020)......................................................12

*In re Wendy's Co. S'holder Derivative Action*,
    --- F.4th ---, 2022 WL 3273771 (6th Cir. Aug. 11, 2022)..............................12, 14

**Statutes**

21 U.S.C. § 337(a)..........................................................................................................20

**Other Authorities**

Fed. R. Civ. P. 23(e)(1)(B)..............................................................................................5

Benzene and Cancer Risk, American Cancer Society (last updated Jan. 5, 2016),
    https://www.cancer.org/cancer/cancer-causes/benzene.html ...................................3

*FDA alerts drug manufacturers to the risk of benzene contamination in certain
    drugs*, U.S. Food & Drug Admin. (last updated June 9, 2022),
    https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-
    manufacturers-risk-benzene-contamination-certain-
    drugs?utm_medium=email&utm_source=govdelivery .........................................7

*Frequently Asked Questions on Benzene Contamination in Drugs*, U.S. Food &
    Drug Admin. (last updated June 9, 2022), https://www.fda.gov/drugs/drug-
    safety-and-availability/frequently-asked-questions-benzene-contamination-
    drugs .........................................................................................................................7

Monograph for Ethanol, U.S. Food & Drug Admin.,
    https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/alcohol.pdf...........7

*Temporary Policy for Preparation of Certain Alcohol-Based Hand Sanitizer
    Product During the Public Health Emergency (COVID-19), Guidance for
    Industry*, U.S. Food & Drug Admin. (updated June 1, 2020), *available at*
    https://www.regulations.gov/document/FDA-2020-D-1106-0020 ..........................7

Valisure Citizen Petition on Benzene in Body Spray Products (Nov. 3, 2021),
    *available at* https://www.regulations.gov/document/FDA-2021-P-1193-0001 ....................16

## INTRODUCTION

As the mediator in this case has confirmed, the Settlement in this case was the product of arm's length, hard-fought negotiations. Decl. of Robert A. Meyer ("Meyer Decl.") ¶ 3. It took a proposal from the mediator to make the settlement possible; the parties could not reach agreement on their own. *Id.* ¶¶ 9–10. The Settlement provides meaningful financial relief to Class Members and requires P&G to make practice changes designed to prohibit similar issues in the future.

Just two of the 56 named plaintiffs in this MDL—Miriam Amselem and Sheri Clayton (the "Objectors")—have asked this Court to deny preliminary approval of the proposed Settlement. They do so even though their counsel reviewed a draft of the Settlement before it was filed with the Court, declined to request any changes to it, and told P&G's counsel that he had "no real concerns" with the Settlement. Decl. of Andrew Soukup ("Soukup Decl.") ¶ 17.

Objectors' counsel had it right before: there are "no real concerns" with this Settlement, and this Court should approve it. In arguing otherwise, the Opposition relies on speculative and unfounded assumptions about the settlement negotiation process. Objectors' real concern with the process is that their counsel disagrees with the choice made by the majority of plaintiffs to engage in early settlement negotiations. That is no basis to deny approval of a settlement.

Objectors fail to identify any valid substantive shortcomings with the Settlement. For example, Objectors criticize the financial relief offered to Class Members under the settlement as worse than the relief P&G offered under its voluntary recall program, but that is an apples-to-oranges comparison. The class includes individuals not eligible to recover under P&G's recall program, and P&G had no obligation to maintain the recall program forever. The Settlement also lets class members choose whether they want to receive a monetary payment, an option rarely provided under the recall. Likewise, Objectors incorrectly argue that the Settlement bars Class Members who participated in the recall program from receiving settlement benefits: Class

1

Members may do so provided they certify that they were not fully compensated under the recall program for all of their relevant purchases of P&G Aerosol Products, and Class Members who cannot make this certification have been made whole by P&G's voluntary recall program.

The remaining criticisms of the Settlement rest on a misunderstanding of the governing regulatory scheme and the Settlement itself. Objectors incorrectly claim that the Food and Drug Administration ("FDA") does not permit any benzene in products. In reality, the FDA's most recent guidance instructs manufacturers to recall aerosol drug products only if they contain benzene in excess of 2 parts-per-million ("ppm"). The Settlement's 1-ppm standard—which also appears in another benzene-related settlement that has obtained preliminary approval—is more rigorous than what the FDA has established. The Settlement also does not bar the FDA—which is neither a party to the Settlement nor a Class Member—from pursuing enforcement actions.

The numbers speak for themselves. Thirty-five of the 56 plaintiffs in these cases—62.5 percent—affirmatively support the Settlement. The remaining plaintiffs declined this Court's invitation to participate in additional negotiations related to the Settlement. Of those plaintiffs, 19 have taken no position on the Settlement, and only two have objected to the Settlement. The concerns raised by these two plaintiffs—represented by the same counsel—are not a basis to delay proceeding with the process of informing the Settlement Class about the proposed Settlement.

## BACKGROUND

### A.      P&G's Comprehensive Investigation into Benzene Contamination.

On November 4, 2021, Valisure LLC, an online laboratory, publicly filed a citizen petition with the FDA. That petition stated that Valisure had tested 108 batches of body sprays from 30 brands made by various companies for the presence of benzene; some but not all of these contained benzene. According to Valisure, 12 batches of P&G's products contained no detectable benzene or levels below 2 ppm, but 10 batches contained benzene levels higher than 2 ppm.

Upon learning of Valisure's allegations, P&G immediately investigated the possible presence of benzene in its products. The investigation revealed that a significant number of P&G's antiperspirant and deodorant aerosol products contained either no detectable benzene or benzene levels below 1 ppm. P&G's investigation also identified some products that did contain levels of benzene above 2 ppm. As a result, P&G proactively expanded its investigation and tested its entire portfolio of aerosol products. Most products did not have issues. However, P&G's testing revealed trace levels of benzene in certain aerosol dry shampoo and dry conditioner products.

Benzene is ubiquitous in the environment, and it is among the 20 most widely used chemicals in the United States.[1] P&G conducted consumer safety assessments based on extremely conservative assumptions, which concluded that even the products with the highest detected benzene levels were unlikely to cause adverse human health consequences for consumers.

Notwithstanding P&G's conclusion that the products were safe, it worked cooperatively with FDA to voluntarily recall all affected products out of an abundance of caution. P&G also made a widely publicized offer to reimburse consumers. The antiperspirant and deodorant recall was announced on November 23, 2021, less than three weeks after Valisure's petition was filed. The dry shampoo and dry conditioner recall was announced on December 17, 2021.

News of P&G's voluntary recall program received widespread coverage. Significant numbers of consumers received reimbursement through the program: P&G issued more than 482,000 vouchers redeemable for the full value of the suggested retail price for the product to an estimated 214,624 consumers with a retail value of $3,594,951. Decl. of Janos Josephson ¶ 5. For consumers who requested cash refunds instead, P&G issued 995 cash payments to 959 U.S.

---

[1] *See* Benzene and Cancer Risk, American Cancer Society (last updated Jan. 5, 2016), https://www.cancer.org/cancer/cancer-causes/benzene.html.

consumers totaling $25,080.84. *Id.* ¶ 6. P&G stopped accepting online requests for reimbursement under its recall program on April 15, nearly five months after it was launched. *Id.* ¶ 4.

> **B.    The Parties' Settlement Negotiations.**

Hours after the Valisure petition was made public, plaintiffs began filing consumer class actions against P&G. The suits sought to represent overlapping classes of consumers based on the same overarching theory: the alleged presence of benzene made the products worthless and entitled consumers to full reimbursement, even though the products otherwise worked as intended.

Over the following weeks, numerous plaintiffs' counsel contacted P&G to raise the prospect of nationwide settlement discussions. *See* Soukup Decl. ¶ 3. P&G's response to each outreach was the same: P&G was willing to discuss nationwide resolution, but only if a sufficiently large group of plaintiffs emerged that expressed a similar interest in settlement. *Id.*

Eventually, a large group of plaintiffs and their counsel approached P&G to express interest in mediation. On February 18, 2022, Gary Klinger reported to P&G's counsel that lawyers representing 28 of the then-42 plaintiffs (in 12 out of the then-25 cases) who had filed claims against P&G were interested in exploring settlement. Soukup Decl. ¶ 8, Ex. D. Because this coalition represented a sizable majority of plaintiffs with claims, P&G agreed to mediate. *Id.*

A mediation occurred on March 28, 2022, but the parties were unable to reach an agreement at that time and remained far apart on many critical terms. *See* Meyer Decl. ¶¶ 4, 8. The parties continued to engage in settlement negotiations over the following weeks. *Id.* ¶ 9. In late April, however, the parties appeared to be at an impasse. In an effort to break the impasse, on April 29, 2022, the mediator made a mediator's proposal. *Id.* ¶ 10. Both parties accepted the mediator's proposal on May 2, 2022, *id.* ¶ 11, and the parties announced to the Court that they had reached an agreement in principle the next day, *see* ECF No. 13.

### C.     P&G Shares Information About The Settlement With Objectors' Counsel, Who Did Not Raise Any Concerns About the Settlement.

P&G promptly complied with this Court's May 4 and June 6 orders to share information about the settlement with plaintiffs' counsel that had not participated in the settlement negotiations. On May 20, Objectors' counsel received the parties' term sheet; on June 7, he was provided access to the same informal discovery that P&G had produced to settling plaintiffs' counsel. Soukup Decl. ¶ 14. The other lawyers who signed the protective order received these materials on a similar timeframe. *Id.* After P&G produced these materials, seven additional plaintiffs supported the Settlement. *Id.* ¶ 15.

Although the Court had invited the remaining lawyers to "engage in additional negotiations" with the parties, ECF No. 21 at 1, P&G heard nothing further from them, Soukup Decl. ¶ 16. With the Court's July 5, 2022 deadline to file a preliminary approval motion looming, P&G's counsel called these lawyers and invited them to discuss any questions or concerns they had about the settlement. *Id.* Only three lawyers—Ruben Honik (Objectors' counsel), Ryan Casey, and Conlee Whiteley—expressed interest in a follow-up conversation, which occurred on June 30. *Id.* ¶ 17. During this call, counsel confirmed they had received a copy of the draft settlement agreement, and they did not request any changes to that agreement. *Id.* At the conclusion of the call, when asked whether he had any questions or concerns regarding the terms of the settlement, Objectors' counsel said that he had "no real concerns" about the Settlement. *Id.*

### PROCEDURAL STANDARD

Fed. R. Civ. P. 23(e) provides that a court "must" preliminarily approve a settlement and direct notice of the settlement to be provided to the class if the court "will likely be able to" finally approve the settlement and certify the proposed settlement class. Fed. R. Civ. P. 23(e)(1)(B). A court should "grant preliminary approval if 'the proposed settlement appears to be the product of

serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with[in] the range of possible approval.'" *Bailey v. Verso Corp.*, 337 F.R.D. 500, 505 (S.D. Ohio 2021).

## ARGUMENT

"At the preliminary approval stage . . . the question now before the Court is simply whether the settlement is fair enough that it is worthwhile to expend the effort and costs associated with sending potential class members notice and processing opt-outs and objections." *Garner Props. & Mgmt., LLC v. City of Inkster*, 333 F.R.D. 614, 626 (E.D. Mich. 2020). Phrased another way, the Court's decision at this time is limited to whether "the Court should direct that notice be given to the class members of a formal fairness hearing, at which evidence may be presented in support of and in opposition to the settlement." *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1015 (S.D. Ohio 2001). For these reasons, "the bar is lower for preliminary approval than it is for final approval." *Garner Props. & Mgmt., LLC*, 333 F.R.D. at 621. The Settlement easily clears this low standard, and none of Objectors' criticisms establish otherwise.

## I. THE SETTLEMENT IS FAIR BASED ON THE MERITS OF THE CLAIMS.

"The most important factor to consider in approving a class settlement is the plaintiffs' probability of success on the merits, particularly when weighed against the recovery provided in the proposed settlement agreement." *Kritzer v. Safelite Sols., LLC*, 2012 WL 1945144, at *6 (S.D. Ohio May 30, 2012) (granting final approval to a settlement). "The lower the likelihood of success on the merits, the more desirable a favorable settlement appears." *Id.* In this case, plaintiffs' claims faced at least four substantial obstacles that make the overall settlement more than fair.

*First*, not every aerosol product in these cases was contaminated with benzene. Because plaintiffs' alleged injury is purely economic—reimbursement of some or all of the price paid for the products—they must show that they actually bought products that contained benzene.

According to Valisure's petition, some of P&G's products are among those that tested negative for benzene. P&G's internal testing confirms that many P&G products contained no benzene. A plaintiff's inability to prove "that she actually purchased . . . products which were adulterated with benzene" will be fatal to their claims. *Schloegel v. Edgewell Personal Care Co.*, 2022 WL 808694, at *2 (W.D. Mo. Mar. 16, 2022) (dismissing claims arising out of purchase of allegedly contaminated sunscreen). But even if individual plaintiffs could prove that they bought a benzene-contaminated product, they will be unable to do so on a classwide basis through classwide proof.

*Second*, plaintiffs cannot establish that any benzene in the products they purchased was at levels that were unsafe or violated any law. No plaintiff in this MDL alleges physical harm from P&G's products. And contrary to the Opposition, the FDA has not prohibited the sale of aerosol products containing benzene. Instead, the FDA has advised manufacturers to recall drug products only if they contain benzene at levels above 2 ppm.[2] In other words, the FDA at present finds nothing harmful, much less unlawful, about selling products that contain trace amounts of benzene. That explains why, for the past two years, the FDA has explicitly permitted the sale of hand sanitizers with benzene levels between zero and 2 ppm,[3] and the FDA generally allows the use of ethanol containing up to 2 ppm of benzene in a range of over-the-counter products.[4]

---

[2] *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs*, U.S. Food & Drug Admin. (last updated June 9, 2022), https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs?utm_medium=email&utm_source=govdelivery; *Frequently Asked Questions on Benzene Contamination in Drugs*, U.S. Food & Drug Admin. (last updated June 9, 2022), https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs ("Drug manufacturers . . . should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm.").

[3] *Temporary Policy for Preparation of Certain Alcohol-Based Hand Sanitizer Product During the Public Health Emergency (COVID-19)*, U.S. Food & Drug Admin. (updated June 1, 2020), *available at* https://www.regulations.gov/document/FDA-2020-D-1106-0020.

[4] Monograph for Ethanol, U.S. Food & Drug Admin., https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/alcohol.pdf.

*Third*, most of plaintiffs' claims require proof that P&G *knew* that it sold products allegedly contaminated with benzene. Plaintiffs will not be able to make this showing: P&G had no knowledge of any benzene contamination until Valisure's petition was filed. The Opposition tries to suggest otherwise by invoking an October 21, 2021 letter P&G received from its contract manufacturer, *see* Opp. at 3–4, but the letter itself did not advise P&G that any of its products had been contaminated with benzene, or that the manufacturer had detected benzene in other products it manufactured. The letter was also dated a mere 13 days before Valisure's petition, and it was not sent to P&G's quality assurance team, as it should have been. P&G's prompt efforts to immediately investigate and recall affected products following the filing of Valisure's petition further confirm that P&G lacked prior notice of benzene contamination.

*Finally*, P&G's widely publicized voluntary recall program, which hundreds of thousands of consumers took advantage of, promptly and efficiently provided the same economic relief that plaintiffs seek in these cases, making the program superior to years of costly class-action litigation. *See, e.g.*, *Treviso v. Nat'l Football Museum, Inc.*, 2018 WL 4608197, at *8 (N.D. Ohio Sept. 25, 2018) (denying class certification and finding reimbursement program superior "when compared to the cost, time and vagaries of a class action"); *Pagan v. Abbott Labs., Inc.*, 287 F.R.D. 139, 151 (E.D.N.Y. 2012) ("[R]ational class members would not choose to litigate a multiyear class action just to procure refunds that are readily available."). Consumers who already received benefits under P&G's recall program would have nothing more to recover in these cases. *See In re Samsung Top-load Washing Mach. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2020 WL 2616711, at *14 (W.D. Okla. May 22, 2020), *aff'd* 997 F.3d 1077 (10th Cir. 2021) (approving settlement when plaintiffs would "have to wrestle against the reality that a voluntary recall meant to address the very injuries complained of here was already in place before many of the claims were brought").

Given these challenges, the benefits that Class Members stand to receive under the Settlement are fair. That is why, with the exception of two plaintiffs represented by the same lawyer, the Settlement enjoys overwhelming support from the named plaintiffs in these cases.

## II. OBJECTORS' CRITICISMS OF THE SETTLEMENT LACK MERIT.

Objectors advance four main criticisms of the Settlement: (1) the settlement talks were procedurally improper, (2) the financial relief is insufficient, (3) the injunctive relief limit of 1 ppm benzene contravenes FDA guidance, and (4) the release is overly broad. None has merit.

### A. The Settlement is the Product of Arm's Length Negotiations.

Based on a series of unfounded assumptions, the Opposition asserts that the Settlement is the product of "[p]rocedurally improper" conduct. Opp. at 2. That assertion is incorrect.

The Settlement was the product of "a robust, adversarial arm's length negotiation process." Meyer Decl. ¶ 14. A highly respected independent mediator, Robert Meyer, spent weeks assisting the parties with their settlement discussions. *See id.* ¶¶ 7–9. In March 2022, a day-long mediation occurred. *Id.* ¶ 4. That mediation was unsuccessful, but the parties continued their negotiations over the next several weeks. *Id.* ¶ 9. Eventually, the parties reached an impasse on key terms, and to break the impasse, Mr. Meyer made a mediator's proposal that the parties ultimately accepted. *Id.* ¶¶ 10–11. In other words, the parties were at such odds during negotiations that it took a mediator's proposal—not a proposal from either party—to break the impasse and reach a settlement. *Id.* ¶ 11. According to Mr. Meyer, "[t]here was no collusion whatsoever in reaching the terms of the settlement," *id.* ¶ 12, and the Settlement reached in this case is fair, reasonable, and adequate and is in the best interests of all parties and the proposed Settlement Class, *id.* ¶ 14.

Even after an agreement in principle was reached, this Court issued two orders to ensure that parties who did not participate in the mediation nevertheless had access to the Settlement and the same informal discovery that had been provided during settlement negotiations. *See* ECF Nos.

14, 21. As this Court explained, the purpose of its orders was to ensure that "Non-Settling Plaintiffs have had a meaningful opportunity to review the Settlement and engage in negotiations regarding the same, if necessary." ECF No. 21 at 2. No party, including Objectors or their counsel, took this Court up on its invitation to propose changes to the Settlement. Soukup Decl. ¶¶ 16–17.

The Opposition nevertheless criticizes the settlement process by falsely claiming that P&G made an "invitation to negotiate" to multiple groups of lawyers. Opp. at 12. P&G did no such thing. Instead, P&G's counsel received outreaches from at least six lawyers or teams of lawyers representing various plaintiffs, each of whom asked whether P&G was interested in entering into discussions to settle the lawsuits that had been filed against P&G on a class-wide, nationwide basis. Soukup Decl. ¶ 3. The message P&G's counsel gave each group was the same: (i) P&G believed a nationwide resolution was appropriate because plaintiffs' claims had no merit and P&G had already given to consumers, through its recall, everything they could hope to achieve through litigation, but (ii) P&G would only be willing to enter into settlement negotiations if a sufficiently large group of plaintiffs emerged that was interested in discussing settlement. *Id.* During these calls, some plaintiffs' lawyers expressly urged P&G to begin settlement negotiations with them or with a very small group of lawyers, and P&G declined to do so because it did not appear that the group interested in discussing settlement represented a sufficiently critical mass of plaintiffs. *Id.* ¶ 4. P&G only agreed to enter into settlement negotiations on February 18, 2022, when it learned that 28 of the then-42 plaintiffs were interested in mediation. *Id.* ¶ 8. Before agreeing to mediate, P&G was informed that no plaintiffs' lawyer who had expressed an interest in being included in this mediation had been excluded from the mediation. *Id.* ¶ 9.

The Opposition next speculates that P&G's strategy in seeking to create an MDL was to "create a rift between counsel" under which P&G would argue for centralization in one forum as

a way to pressure those supporting centralization in a different forum into "negotiat[ing] from a position of weakness." Opp. at 9. Again, this is inaccurate speculation.[5] According to Mr. Meyer, the JPML proceedings "had no impact on the parties' settlement negotiations." Meyer Decl. ¶ 12. But even if Objectors are right that plaintiffs' counsel believed they were negotiating "from a position of weakness" prior to the Panel's decision, by the same reasoning they should have felt emboldened by the Panel's April 7, 2022 decision to centralize the cases in their preferred venue. Under Objectors' logic, after the Panel's ruling, plaintiffs' counsel that negotiated the Settlement no longer had any reason to put their self-interest above those of the Settlement Class.

Objectors' true frustration with the settlement process is that their counsel's efforts to "coordinate a plaintiff-side approach to establish a unified front" against settlement discussions failed. Opp. at 7. The record appears to reflect the emergence of two groups among plaintiffs' counsel. One group, representing a majority of plaintiffs, favored early resolution discussions, recognizing that P&G's recall program had provided significant relief to the putative class and that forcing P&G to incur further litigation expenses would only diminish the amount the class could recover in any settlement. Another smaller group that Objectors' counsel was attempting to lead had no desire to engage in early resolution.[6] A single plaintiffs' lawyer's belief that settlement

---

[5] As P&G's counsel told the Panel at oral argument: "[I]t was most important to P&G to have these cases centralized. We looked to the recent precedent of what this panel did and tried to draw conclusions based on that." Tr. 6:4-7, *In re Procter & Gamble Aerosol Prods. Mktg. & Sales Pracs. Litig.*, MDL No. 3025 (J.P.M.L. Mar. 31, 2022), ECF No. 68. That explains why P&G asked the JPML to centralize these cases in the same venue it had recently centralized another benzene litigation, even though (as here) the defendant was not headquartered in that venue.

[6] Objectors' counsel claims that during his December 15, 2021 call with P&G's counsel, P&G's counsel "did not disagree" that discussions about early resolution "may be premature given there had been no JPML transfer and leadership appointment." Opp. at 7 (citing Honik Decl. ¶ 2). This is inconsistent with P&G's counsel's recollection of the conversation. *See* Soukup Decl. ¶ 5. Moreover, if Objectors' counsel truly believed that P&G thought early settlement efforts were premature, then it is unclear why Objectors' counsel would attempt two days later "to reach out to

---

discussions were "premature" until he was willing to join them is no basis to criticize a negotiation process as improper, especially when that process enjoyed the support of a majority of plaintiffs.

In their bid to argue otherwise, Objectors repeatedly misconstrue the record and the apparent strength of the coalition their counsel attempted to assemble. For example, Objectors try to portray the settlement as the process of a "reverse auction," Opp. at 1–2, and accuse P&G of attempting to "to 'shop around' for the best deal," *id.* at 7. That did not occur here. A "reverse auction" occurs when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *In re Wendy's Co. S'holder Derivative Action*, 2020 WL 13169460, at *8 (S.D. Ohio Jan. 24, 2020), *aff'd* 2022 WL 3273771 (6th Cir. Aug. 11, 2022). But "concrete evidence of collusion" is required to support an allegation of a reverse auction, *Echard v. Wells Fargo Bank N.A.*, 2022 WL 1210321, at *5 (S.D. Ohio Apr. 25, 2022) (Watson, J.), and Objectors have <u>zero</u> evidence of such collusion. The independent mediator has flatly stated that "[t]here was no collusion whatsoever in reaching the terms of the settlement, nor any 'reverse auction.'" Meyer Decl. ¶ 12; *see In re Wendy's Co. S'holder Derivative Action*, --- F.4th ---, 2022 WL 3273771, at *6 (6th Cir. Aug. 11, 2022) (rejecting allegations of collusion where settlement was "well-supported by the declaration of the mediator . . . , who averred under penalty of perjury that the mediation occurred at arm's length"). P&G's own conduct should refute any "shopping around" allegations: in April 2022, P&G was asked whether it would mediate with a different group of lawyers (including, allegedly, Objectors' counsel) that had heard the March 2022 mediation was unsuccessful, but P&G never proceeded

---

all plaintiffs' counsel in known cases to informally coordinate a plaintiff-side approach to establish a unified front against any effort by Defendant to peruse a 'fire sale' early settlement." Opp. at 7.

with this second mediation.  *See* Soukup Decl. ¶ 12.

Objectors also make much of a January 28, 2022 email from Objectors' counsel to P&G's counsel, where Objectors' counsel tried to portray interest in early settlement talks as the product of "rogue plaintiffs."  Opp. at 10.  Objectors ignore the follow-up exchange, where their counsel eventually provided a chart of "lawyers/cases" he believed "are aligned with us."  Soukup Decl. ¶ 7, Ex. B.  It turned out that he overstated his support:  of the cases besides his own he believed were "aligned" with him, five confirmed the following week they were willing to participate in a mediation, seven now support the Settlement, and none opposes the Settlement.  *Id.* ¶ 7.

In sum, the record confirms there is nothing improper about the process by which this settlement was negotiated.  At the time P&G agreed to mediate, it did so after 28 of the then-42 plaintiffs in 12 of the then-25 cases had expressed an interest in mediation.  The Settlement now has the support of 35 of the 56 plaintiffs and their counsel, including seven plaintiffs and their counsel who were not initially included in settlement negotiations but later supported the Settlement after learning of its terms.  Of the remaining counsel that did not participate in the mediation process, only three lawyers took P&G up on its invitation to discuss the Settlement, and only one has opposed preliminary approval of the Settlement.

**B.     The Monetary Compensation Provided to the Class is Fair.**

Objectors also criticize the financial relief offered under the Settlement.  In evaluating the relief offered in a class action settlement, the "determination of what constitutes a 'reasonable' settlement is not susceptible of a mathematical equation yielding a particularized sum. Rather . . . in any case, there is a range of reasonableness."  *Amos v. PPG Indus., Inc.*, 2015 WL 4881459, at *3 (S.D. Ohio Aug. 13, 2015).  In other words, "the district court [is] tasked with deciding not whether the proposed settlement [is] the best one imaginable, but only whether it [is] fair and

adequate under the relevant circumstances." *In re Wendy's Co. S'holder Derivative Action*, 2022 WL 3273771, at *7.

That bar is easily met here. For each P&G Aerosol Product purchased, Class Members may request either (i) a $3.50 monetary payment, equal to approximately 70 percent of the average retail price of the Products, or (ii) a voucher equivalent to the current retail price of each Product purchased by Class Members. ECF No. 23-1, §§ 3.2(a), (b). Class Members who can prove they purchased a Product generally face no limit on the number of claims they can submit. *Id.* § 3.2(a). Class Members who cannot prove they purchased a Product generally are limited to receiving compensation for up to three Products purchased per Household. *Id.* §§ 3.2(b)(i), (ii). This relief is more than reasonable, particularly when "balanced against the possibility that the Class Members will receive nothing by going forward on the merits of their claims," given the weaknesses identified above. *In re Broadwing, Inc.*, 252 F.R.D. 369, 373 (S.D. Ohio 2006).

The Opposition nevertheless claims that the Settlement should not be preliminarily approved "because the recovery is less than what Defendant already provided to the Settlement Class under the recall program." Opp. at 15. There is no requirement that a settlement can only be approved if the relief provided exceeds the relief a defendant was already willing to voluntarily make available, and Objectors cite no authority supporting this point. Nor is there any requirement that P&G maintain its voluntary recall program indefinitely. To the contrary, courts have approved settlements where the relief offered to class members was less than the amount of the relief defendants previously made available. *See Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 570, 576 (9th Cir. 2004) (affirming approval of settlement where class members received rebate that was only 16% to 27% of rebate previously voluntarily offered by defendant during recall); *Gemelas v. Dannon Co.*, 2010 WL 3703811, at *2 (N.D. Ohio Aug. 31, 2010) (rejecting as

"meritless" an objection that a "proposed settlement provide[d] no additional relief than that which Dannon previously voluntarily offered before the lawsuit was filed"). And unlike the recall program, where consumers needed to contact P&G to receive cash refunds, the Settlement gives Class Members the option to request monetary payments through the claims process.

Most of Objectors' criticisms focus on provisions of the Settlement affecting Class Members who lack proof of their purchases. *See* Opp. at 16 (criticizing limitation on three vouchers or payments per household). Given the extensive relief P&G already provided to consumers through its widely publicized recall program, P&G is understandably less willing to provide still more relief to a broader group of individuals who cannot prove that they purchased a product (much less one contaminated with benzene). *See, e.g.*, *Parker v. Time Warner Entmt. Co.*, 239 F.R.D. 318, 339 (E.D.N.Y. 2007) ("A claim which cannot be proven is worth essentially nothing."). And courts have approved settlements that limit claims on a household basis as an appropriate "means to prevent fraud." *Broomfield v. Craft Brew Alliance, Inc.*, 2020 WL 1972505, at *20–21 (N.D. Cal. 2020) (rejecting objection based on agreement's household limit and collecting cases approving settlements with household limits); *see also In re Packaged Ice Antitrust Litig.*, 2018 WL 4520931, at *2 (6th Cir. May 24, 2018) (approving settlement where payments made on per-household basis).

The Opposition finally criticizes the period Class Members have to submit claims after notice is provided. Completing the claims process before final approval enables the court to consider the class participation rate when determining whether the settlement is fair, reasonable, and adequate. *See, e.g.*, *Smith v. CSX Transp., Inc.*, 2015 WL 4389574, at *1 (N.D. Ohio June 18, 2015) (granting final approval after assessing, among other things, "the number and amount of claims made"). A claims submission period of at least sixty days—which is what the Settlement

permits—is also common, as reflected in the many decisions from other judges in this Court approving settlements with similar provisions. *See, e.g.*, *Doe One v. CVS Healthcare Corp.*, 2019 WL 4893834, at *1 (S.D. Ohio Oct. 4, 2019) (class members must file claims within 60 days after mailing of notice); *Gascho v. Glob. Fitness Holdings, LLC*, 2013 WL 12354005, at *3 (S.D. Ohio Sept. 30, 2013) (class members "shall have 60 days to submit a Claim Form"); *Lewis v. Huntington Nat'l Bank*, 2013 WL 12230882, at *2 (S.D. Ohio Mar. 13, 2013) (claims must be returned by "no later than sixty (60) days after the initial mailing of the Claims Administrator of the Notice").

### C. The Settlement Agreement's Injunctive Relief Imposes More Stringent Requirements as Compared to Current FDA Guidance.

The Opposition focuses on a provision of the Settlement that prohibits P&G from selling Aerosol Products that contain more than 1 ppm of benzene. *See* ECF No. 23-1, § 3.5(c). The Opposition nevertheless claims that this Settlement provision "would gut FDA Guidance as to permissible levels of benzene in the Products." Opp. at 13. Not so.

As a threshold matter, a court recently preliminarily approved another settlement involving the alleged presence of benzene in sunscreen products that contained a similar provision. *See* Class Action Settlement Agreement at 12–13, *In re Johnson & Johnson Aerosol Sunscreen Mktg., Sales Pracs. and Prods. Liab. Litig.*, No. 0:21-md-3015 (S.D. Fla.), ECF No. 55-9.

Moreover, and contrary to Objectors' arguments, there is no existing FDA limit on the levels of benzene that may be present in consumer aerosol products. Indeed, that explains why Valisure's petition asked the FDA to set regulatory limits for benzene levels in aerosol products. *See* Valisure Citizen Petition on Benzene in Body Spray Products at 2–3 (Nov. 3, 2021), *available at* https://www.regulations.gov/document/FDA-2021-P-1193-0001. The Settlement therefore does what the FDA has not yet done: impose testing obligations on P&G and its suppliers that will prevent P&G from selling Aerosol Products that contain levels of benzene that exceed 1 ppm.

Far from being a basis to reject the Settlement, these product controls are a reason to approve the Settlement because they will prevent similar contamination issues from arising in the future. *See Does 1-2 v. Déjà Vu Servs. Inc.*, 925 F.3d 886, 897 (6th Cir. 2019) (affirming approval of settlement that involved, among other things, "injunctive relief [that] mandates extensive changes to [defendant's] business practices"); *Pelzer v. Vassalle*, 655 F. App'x 352, 362 (6th Cir. 2016) (approving in part because the settlement's "purely prospective relief . . . will help prevent similar issues in the future" and will "serve the public going forward"). To the extent class members contest the adequacy or value of these practice changes, such objections are properly raised at the final fairness hearing—not at the preliminary approval stage, where the court need only determine that the settlement falls "with[in] the range of possible approval.'" *Bailey*, 337 F.R.D. at 505.

In arguing otherwise, the Opposition relies exclusively on the "Q3C Guidance"—a 1997 FDA guidance document that has no applicability here. As the Opposition admits, the Q3C Guidance document "is not binding." Opp. at 14. Nor is it true that the 1997 document "represents 'FDA's current thinking on this topic.'" *Id*. To the contrary, on December 23, 2021, the FDA issued a non-binding alert requesting that manufacturers recall drug products only if they have benzene levels above 2 ppm (which P&G had already done by the time that alert was issued). *See supra* n.2. Manufacturers that detect levels of benzene below this limit are encouraged to report their findings to the FDA, but are not asked to recall the products. If the FDA currently believed aerosol products should not contain any benzene, it would not recommend that manufacturers recall products only if they have benzene levels in excess of 2 ppm. The Opposition wholly ignores this more recent, directly on-point alert, which confirms that the Settlement *requires* P&G to do more than what the FDA has *informally asked* drug manufacturers to do.

## D. The Release in the Settlement Agreement is Appropriate.

The Opposition closes with three meritless criticisms about the release in the Settlement.

### 1. The release is not overly broad.

The Opposition claims that releasing claims relating to "the purchase or use of any of the P&G Aerosol Products" is impermissibly overbroad, Opp. at 17–18, but this argument misses the mark. A settlement may release any claims that "share a 'factual predicate' with the claims pled in the complaint." *Déjà Vu Servs.*, 925 F.3d at 900. In applying this test, courts have "fallen back on the broad conclusion that the test requires only a common nucleus of operative fact, and hence have equated the test with the normal transactional test underlying the scope of claim preclusion itself." 6 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 18:19 (6th ed.). Where the case involves claims arising out of a transaction, the relevant factual predicate is the transaction itself, and therefore the release may permissibly include "all claims arising out of the transaction with which the release was concerned." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 282 (3rd Cir. 2014); *see also Halley v. Honeywell Intern., Inc.*, 861 F.3d 481, 494 (3rd Cir. 2017) ("It is not unusual for a class settlement to release all claims arising out of a transaction or occurrence.").

These are cases for economic damages based on the price paid to buy a product. Those are the claims released by the Settlement, which does not release claims for personal injuries. ECF No. 23-1, § 1.36. The relevant factual event therefore is the purchase of the products. If this case were litigated to judgment, Class Members would be precluded from bringing other claims against P&G arising out of their purchase of the products. For this reason, courts have approved settlements containing similar or broader releases of claims arising out of or relating to the purchase of the product. *See, e.g.*, *Schneider v. Chipotle Mexican Grill, Inc.*, 2020 WL 511953, at *1, 3 (N.D. Cal. Jan. 31, 2020) (preliminarily approving settlement with release covering "all claims . . . connected with, arising from, or in any way whatsoever relating to the purchase of the Food Products" in question); *In re Packaged Ice Antitrust Litig.*, 2012 WL 5493613, at *3 (E.D. Mich. Nov. 13, 2012) (approving settlement with release of "all claims, known and unknown,

resulting from the purchase" of the packaged ice in question); *In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 WL 780512, at *2, *22 (E.D. Mich. Dec. 1996) (approving settlement releasing all claims arising out of purchase of hair products). Indeed, on at least one other occasion, Objectors' counsel negotiated a classwide settlement that released all claims relating to the purchase of a product. *See, e.g.*, *David v. American Suzuki Motor Corp.*, No. 08-cv-22278, ECF No. 107-1 at 6 (S.D. Fla. Mar. 26, 2010) (releasing "any and all claims, . . . known or unknown, . . . that are or could have been pleaded in the Action regarding *any aspect* of the 2005 or 2006 model year Suzuki GSX-R1000 motorcycle" (emphasis added)).

Objectors provide no authority to support their contrary position that the release may only be limited to claims relating to "Defendant's failure to disclose the presence of benzene." Opp. at 19. The sole case they rely on for support, *Chavez v. PVH Corp.*, 2015 WL 581382 (N.D. Cal. Feb. 11, 2015), was a wage payment case that had nothing to do with the purchase of a product. Further, the parties in *Chavez* agreed that the release covered claims based on employment practices unrelated to those challenged in the operative complaint, *id.* at *5–6, whereas the claims covered by the Release here all arise out of the same purchase of a product.

### 2. The release appropriately bars claims from those who have been made whole by P&G's recall program.

The Opposition also incorrectly asserts that the Settlement prohibits Class Members "who received four or more vouchers or cash vouchers under the recall program" from submitting a claim under the Settlement. Opp. at 19. To be sure, the Opposition correctly notes that the Settlement reduces the number of vouchers or payments a Class Member may receive by the vouchers or payments a Class Member *already* received under P&G's recall program. But Section 3.2(c)(iii) of the Settlement guarantees *every* Class Member who participated in P&G's recall program the right to receive at least one payment or voucher: all the Class Member has to do is to

certify that he or she was not fully compensated for their purchases through P&G's recall program. So that the record is clear, Section 3.2(c)(iii) is not limited to Class Members who received *exactly* three vouchers under P&G's recall program, but rather applies to any Class Member who received three or more vouchers under that program.

To the extent the Objectors take issue with the fact that the Settlement bars claims from some Class Members, the only ones who are in this position are those who have been fully compensated for their harm through P&G's recall program. That is not a reason to deny preliminary approval. *See McAlarnen v. Swift Transp. Co.*, 2010 WL 365823, at *10 (E.D. Pa. Jan. 29, 2010) (granting final approval to a settlement where some class members did not receive "any benefit" from the settlement agreement because they already had received the relief sought by the class). In any event, even those Class Members who are not eligible to make claims for cash or vouchers still benefit from the Settlement's robust practice changes.

### 3. The release does not preclude the FDA from enforcement actions.

The Opposition's final argument—that the Release bars the FDA from bringing an enforcement action against P&G—is without merit. The FDA is not a party to the Settlement, nor is it a Class Member. It is "well-established" that "the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests." *Herman v. S.C. Nat. Bank*, 140 F.3d 1413, 1425 (11th Cir. 1998). Furthermore, when the FDA brings an enforcement action, it is doing so "by and in the name of the United States"—not by, for, on behalf of, or through Class Members. 21 U.S.C. § 337(a). Accordingly, the Settlement does not affect FDA's ability to bring such an enforcement action.

### CONCLUSION

This Court should grant Plaintiffs' motion for preliminary approval.

DATED: August 12, 2022

Respectfully submitted,

s/ Henry Liu
Henry Liu (0082917)
Andrew Soukup (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street NW
Washington, DC 20001
Telephone: +1 202 662 6000
Email: hliu@cov.com
Email: asoukup@cov.com

Amy Heath (*pro hac vice*)
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: +1 415 591 6000
Email: aheath@cov.com

Keith Shumate (0056190)
Kathryn M. Brown (0100426)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: +1 614 365 2700
E-mail: keith.shumate@squirepb.com
E-mail: kathryn.brown@squirepb.com

Scott A. Kane (0068839)
Jennifer L. Dollard-Smith (0093624)
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: +1 513 361 1200
E-mail: scott.kane@squirepb.com
E-mail: jennifer.dollard-smith@squirepb.com

*Counsel for Defendant The Procter & Gamble Company*

## CERTIFICATE OF SERVICE

I certify that on August 12, 2022, I caused to be electronically filed the foregoing Response to Plaintiffs Miriam Amselem and Sheri Clayton's Opposition to Motion for Preliminary Approval of Class Action Settlement. Notice of this filing will be sent by electronic mail to all parties who filed a notice of appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

s/ Henry Liu

Henry Liu